Mark H. PACK et al., Plaintiffs,

v.

CORPS OF ENGINEERS OF the UNITED STATES ARMY et al., Defendants.

No. 77–83–Civ–J–Y.

United States District Court, M. D. Florida, Jacksonville Division.

Feb. 25, 1977.

As Amended April 25, 1977.

Almer W. Beale, II, Gary A. Bubb, Jacksonville, Fla., for plaintiffs.

John L. Briggs, U. S. Atty., Ernst D. Mueller, Jacksonville, Fla., for defendants.

## MEMORANDUM OPINION

GEORGE C. YOUNG, District Judge.

This case involves a dispute between the United States Army Corps of Engineers and commercial shrimpers on the northeast coast of Florida over the environmental impact on shrimp and other marine life of proposed dredge and fill activities designed by the Corps of Engineers to prevent erosion of the Duval County beaches.

The complaining parties seek a preliminary injunction against further action by the agency pending a more complete review of the adverse environmental consequences of such a project on the shrimp resources contained in the waters of the Atlantic Ocean just off the Duval County shore.

The focus of this Court's review of the proposed federal agency action is upon whether the environmental impact statement compiled by the Corps during its consideration of the beach erosion control project satisfies the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq.

Plaintiffs in this cause are two commercial shrimpers who are residents of Mayport and Atlantic Beach, Duval County, Florida, and the Northeast Florida Shrimp Association, a resident non-profit corporation located in Mayport, Duval County, Florida, whose members are numerous commercial shrimpers and affiliates of the shrimp industry in the Jacksonville, Duval County, Florida area.

Defendants are the Corps of Engineers of the United States Army, Martin R. Hoffman, Secretary of the Army, and Colonel Donald A. Wisdom, District Engineer of the Corps of Engineers for the Jacksonville, Florida District.

This Court has jurisdiction over the subject matter of this action by virtue of the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq. and 28 U.S.C. §§ 1331, 1361, 2201 and 2202.

The overall project to which this lawsuit relates is the Duval County Beach Erosion Control Project which is designed to place dredged sand upon approximately ten (10) miles of beaches along the Duval County shoreline. The particular focus of this case is phase one of the project which contemplates the placement of sand along a portion of that shoreline, extending from the beach at Katherine Abbey Hanna State Park south to Atlantic Boulevard, the southernmost tip of Atlantic Beach.

The gravamen of plaintiffs' complaint and the basis for the application for a preliminary injunction is that the final Environmental Impact Statement (EIS) of the Corps, relating to the entire beach fill project, was allegedly fatally deficient in its treatment of the possible adverse environmental effects on shrimp and other marine life in the offshore waters of the project area.

Specifically, the plaintiffs seek to restrain the Corps from moving forward with the project at this time and that the Corps be required to revise the EIS so as to more particularly disclose all adverse environmental effects on shrimp and to provide meaningful discussion of possible alternatives to the project which would have less detrimental effects on shrimp.

Plaintiffs are asserting conservation and economic interests in protecting the environment as it relates to shrimp and shrimp productivity in the waters along the Duval County shoreline and allege irreparable harm to such interests if the Corps is not restrained from continuing the project and a more thorough treatment of the possible impact upon shrimp undertaken in the EIS.

This action was filed on January 31, 1977, along with a motion for a temporary restraining order, which motion was granted and a temporary restraining order entered for ten (10) days by District Judge Charles Scott of the Jacksonville Division of this Court. Upon stipulation of the parties and the approval of this Court, the temporary restraining order was continued for an additional ten (10) days on February 9, 1977. Plaintiffs' motion for a preliminary injunction was filed on February 9, 1977, and this Court conducted an evidentiary hearing on the motion for preliminary injunction on February 12, 1977, and heard oral arguments on February 17, 1977. Today, upon the findings and conclusions which follow, the restraining order will be vacated and the motion for preliminary injunction denied.

The facts leading up to the ultimate clash between the shrimpers and the beach restoration project are not in dispute. The Duval County Beach Erosion Control Project was authorized by Congress in 1965, by Section 301, of the Rivers and Harbors Act, Public Law 89–298, 79 Stat. 1073. This authorization followed a study of the beach erosion problem in Duval County prepared at the request of Congress in the wake of severe northeastern storms occurring in November and December 1962, and Hurricane Dora, which struck Duval County in the summer of 1964, all of which ravaged large portions of the beach south of the mouth of the St. Johns River from the Mayport Naval Station to the St. Johns County line.

The project, which is to be accomplished in two phases, contemplates the placement of approximately 3.3 million cubic yards of sand along approximately ten (10) miles of beach in Duval County. Of this amount, approximately 1.1 million cubic yards is intended to be advance renourishment fill, precluding the necessity for renourishment of the beach for approximately four to five years.

After the expiration of this four to five year period, unless severe storms make it necessary sooner, it is contemplated that additional periodic renourishment at the rate of approximately 260,000 cubic yards of sand annually over the ten (10) mile stretch of beach may be required to combat continuing erosion. It is anticipated that this periodic renourishment will be carried out every two (2) years, as needed, over the proposed fifty (50) year life of the project.

The project is intended to restore the rapidly eroding stretch of beach from Katherine Abbey Hanna State Park to the St. Johns County line to full public use and enjoyment and reduce or eliminate existing periodic public and private property losses due to erosion and storm-induced wave actions.

The project contemplates the taking of the initial fill from an offshore borrow area in the Atlantic Ocean, east of Atlantic Beach, Florida. The sand for the periodic renourishment programs will be obtained, when available, from dredging activities in the St. Johns river channel, supplemented by further dredgings from offshore borrow sites if necessary.

A draft EIS covering the entire project was completed on June 4, 1974, and public notice thereof was issued with comments being requested from federal, state and local agencies.

The draft EIS was filed with the Council on Environmental Quality on June 14, 1974.

A public meeting on the project was held on August 26, 1974.

The final EIS, which included all comments received from federal, state and local agencies was completed and submitted to the Council on Environmental Quality in September 1975. On June 7, 1976, the Florida Department of Environmental Regulation issued a State Permit allowing the project to proceed. A public notice describing the project in detail, including a map illustrating the portions of the beach involved and the proposed borrow area, was issued on June 10, 1976.

Thereafter, on July 22, 1976, Colonel Wisdom, the Jacksonville District Engineer for the Corps, signed a Statement of Findings, which concluded with the decision to proceed with this project. On August 3, 1976, a public notice of the decision to proceed was issued, but no response was received. Consequently, bids for the first phase of the project were invited on September 27, 1976.

However, in early November 1976, plaintiffs contacted the Corps and voiced objections to the project.

Several meetings between the Corps of Engineers and plaintiffs ensued. The primary focus of plaintiffs' complaints was the location of the source for the sand, a borrow site in the ocean approximately 3½ miles off the coast. Plaintiffs claimed that the proposed borrow site was in the middle of their prime shrimp fishing grounds. They were concerned both with the fact that the depression created would interfere with the dragging of their shrimp nets, and with the possibility that shrimp in the area would be harmed by the suction action of the dredge. At a meeting held on November 8, 1976, the Corps agreed to look for a new borrow site east of the line drawn by plaintiff Pack on a map, which delineated the prime shrimping areas of the plaintiffs. At this meeting, the Corps also agreed not to award a contract before conferring again with plaintiffs concerning the location of the proposed borrow site.

On January 28, 1977, after expending an additional $25,000 in a search for a new borrow site outside the prime shrimping grounds delineated by plaintiff Pack, the Corps publicly announced that it had found a new borrow site that met the shrimpers' objections. The new site was located approximately 2.2. miles east of the vertical line previously drawn by the plaintiff Pack on the map (which was subsequently introduced at the hearing as plaintiffs' Exhibit # 3), and approximately 5½ miles east of the Duval County shoreline.

Plaintiffs however subsequently indicated dissatisfaction with the manner in which the fill was to be placed on the beach areas. As a result, the parties were unable to reach an amicable agreement. Consequently, the temporary restraining order was sought and entered, and the motion for preliminary injunction was filed.

At the outset of the hearing on the motion however, plaintiffs' attack on the project was blunted somewhat by the representation of Colonel Wisdom, on behalf of the Corps of Engineers, that in order to accommodate the shrimpers, the Corps agreed for the life of the project to never obtain fill material from the offshore waters of Duval County, designated by the plaintiffs as traditional shrimping grounds. The specific area referred to consists of the offshore waters west of a red line running primarily in a north-south direction as drawn on the chart admitted in evidence in this case as plaintiffs' Exhibit # 3, and acknowledged by both sides as the most productive shrimping areas along the northeastern Florida coast.

In view of the specific representation of the Corps' duly authorized representative that it is the intent of the Corps to procure all the necessary fill for this project from areas other than that previously designated by the plaintiffs as the traditional shrimping grounds in the Duval County area, the Court finds that the Corps is bound by such representation, that it is established as the law of this case, and subsequent rulings of the Court are predicated thereon.

Additional facts were adduced from the evidence presented by the parties at the hearing on plaintiffs' motion. It was estab-

lished that the offshore waters of Duval County, Florida, are a valuable fishery providing a home for various forms of marine life, including but not limited to shrimp. Shrimp are important from the commercial fishing standpoint.

Several expert biologists testified in connection with this matter. Plaintiffs' expert stated that shrimp sucked up by the dredge at the borrow site would be destroyed, that other shrimp in the vicinity of the dredge while it was operating would be forced to leave the immediate area, and further that turbidity created along the fill site would cause shrimp to leave the area, while many benthic organisms, including some shrimp, would be killed by the placing of the fill.

One of the Corps' experts testified that any adverse effect on the shrimp at the borrow area would be temporary and minimal. He noted that no significant number of commercial shrimp lived in the immediate area where the fill was to be placed, and that most of those which did would be able to move away from the activity because of the natural mobility of the shrimp.

Moreover, the Corps' experts testified that the overall shrimp population available for the shrimpers' activities would not be severely reduced by the project because the limiting factor which controls the new population of shrimp each year is the availability of suitable nursery space in the estuaries where the shrimp larvae migrate during the maturation process. Invariably, more larvae reach the nurseries than can be accommodated. Therefore, the destruction of a sizeable number of the shrimp larvae by the dredge and fill activities prior to the larvae entering the nursery grounds would have only a minimal effect on the subsequent year's shrimp productivity.

The plaintiffs, however, complain that the project will have severe adverse effects on the shrimp. The primary thrust of the plaintiffs' complaint is that the EIS is inadequate because it fails to disclose the adverse environmental effects the project

might have on the shrimp and the shrimping industry. Plaintiffs further complain that alternatives to the proposed project which would have less detrimental effects on shrimp are not adequately discussed in the EIS. Specifically, plaintiffs allege in their motion and paragraph 16 of the complaint that the EIS fails to comport with the requirements of § 102(2)(C) of NEPA and the guidelines promulgated thereunder by the Council on Environmental Quality.

In analyzing plaintiffs' claim, the Court is bound by established law to evaluate the plaintiffs' request for a preliminary injunction according to the traditional four-pronged test: (1) whether there is a substantial likelihood that plaintiffs will prevail on the merits; (2) whether the plaintiffs are in danger of suffering irreparable injury; (3) whether the potential harm to the defendant from the issuance of the injunction outweighs the possible harm to the plaintiffs if injunctive relief is denied; and (4) whether issuance of the preliminary injunction will serve the public interest. *Blackshear Residents v. Romney*, 472 F.2d 1197 (5th Cir. 1973); *Allison v. Froehlke*, 470 F.2d 1123 (5th Cir. 1972).

With regard to the plaintiffs' likelihood of success on the merits, the defendants initially raise the issue of the plaintiffs' standing. Defendants contend that the plaintiffs are asserting only a personal economic interest in the outcome of this litigation, so they are not within the "zone of interests" sought to be protected by the Act in question. *Data Processing Service v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1972); *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

In the opinion of the Court, however, the mere fact that the plaintiffs may possess a personal interest in the outcome of this litigation is not conclusive on the question of standing. A financial interest in the outcome is not in and of itself sufficient to exclude the plaintiffs from having standing.[1]

---

1. Although it has been held in certain instances that a financial interest in the outcome of

litigation standing alone will not suffice to confer standing upon plaintiffs asserting solely

To the contrary, it appears to the Court from the grounds upon which the complaint was filed and the type of project involved, that the subject matter to which the complaint is directed is within the area contemplated by the Act. The plaintiffs assert a conservation and environmental interest in the preservation of the shrimp and other marine life, in addition to their naturally strong desire to protect their means of making a living. It appears only reasonable therefore that plaintiffs are competent parties to raise a question concerning the adequacy of the EIS.

The plaintiffs have standing to raise the issues and to have those issues finally determined without consideration of any self-interests which the plaintiffs might have, except insofar as it becomes necessary in balancing the harm to the plaintiffs or to the defendants which might result if the requested restrictive action is or is not granted.

With regard to the plaintiffs' attack on the sufficiency of the EIS, in evaluating the content of the EIS the Court turns to the recent case in this Circuit of *Sierra Club v. Morton*, 510 F.2d 813 (5th Cir. 1975) for guidance as to the appropriate principles to be applied in determining whether the EIS satisfies the requirements of NEPA.

In a carefully considered, thorough, and definitive opinion, the Fifth Circuit in *Morton, supra*, set out the various considerations governing a determination of the adequacy of the EIS as required by NEPA.

■ Initially, as pointed out in *Morton*, the burden of proof rests with the plaintiffs who are alleging a deficiency. The Court stated that: "plaintiffs [are] required to establish by a preponderance of the evidence, rather than by a prima facie showing of deficiencies, that the EIS . . . [is] inadequate." 510 F.2d at 818. In assessing the sufficiency of the EIS herein, it is against this standard of required proof that

the Court must evaluate the evidence adduced and the record before the Court.

The Court's analysis of the EIS begins with a statement of the purposes of the Act as outlined by the Fifth Circuit in *Morton, supra*:

"'The purposes of an environmental impact statement are to detail the environmental effects of proposed federal action 'to enable those who did not have a part in its compilation to understand and consider meaningfully the factors involved,' and to compel the decisionmaker to give serious weight to environmental factors in making discretionary choices. Section 102(2)(C) seeks these goals by specifically requiring a detailed statement." [Citations omitted] 510 F.2d at 819.

The "detailed statement" should disclose a good faith effort to take into account the values NEPA seeks to safeguard by providing the public with information concerning the environmental costs involved in ·a project by being "written in language that is understandable to nontechnical minds and yet contain enough scientific reasoning to alert specialists to particular problems within the field of their expertise. . .."; and to help insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug. 510 F.2d at 820 (Citations omitted).

■ The standard adopted by the Courts for evaluating the EIS therefore is a rule of reason approach, as neither the Act nor the Courts which have construed its provisions require the impossible to be obtained. As explained by one District Court in making a similar determination:

"The complaint and the EIS are to be tested by a standard which requires, not perfection, but that the appropriate federal agency has gone through a process of 'individualized consideration and balancing factors—conducted fully and in good

---

such an interest, see *Churchill Truck Lines v. United States*, 533 F.2d 411, 416 (8th Cir. 1976) and *Clinton Community Hospital Corp. v. Southern Maryland Medical Center*, 510 F.2d 1037 (4th Cir. 1975), under the circumstances

of this case the fact that the plaintiffs possess such an economic interest in the outcome is not sufficient to exclude them from having standing.

faith' . . . ." [Citations omitted] *East 63rd Street Association v. Coleman,* 414 F.Supp. 1318, 1322 (S.D.N.Y.1976).

■ It is the opinion of this Court that the EIS in this case adequately sets forth the problems which existed at the time the study was undertaken and the effects on the environment which might result from the activities intended. Additionally, the EIS manifests a careful consideration of both the short-term and the long-term effects of the project on the environment, and of the alternatives available to the project, and further contains the necessary balancing of the effect on the environment of not doing the work as opposed to the results if the project goes forward, all in such a way as to satisfy the requirements of the Act and to give the appropriate notice to all interested parties of the scope of the project and the likely consequences thereof.

In the section of the EIS dealing with the environmental setting without the project, in ¶¶ 2.16–2.18, the EIS makes a clear reference to a commercial and sport fishery for shrimp which is important to the local economy, existing in the target area. The EIS goes on to state that such organisms will be directly affected by the proposed dredge and fill activities.

In summarizing the adverse environmental effects of the project, the EIS states that the project will cause increased turbidity in the water where the fill is placed and the sand dredged. Benthic organisms in the borrow area will be destroyed by dredging, and organisms in the fill area will be covered. The EIS explains that the term "benthic organisms" includes "decopods" which is the scientific name for shrimp, as designated in Appendix 2, as well as many smaller marine organisms upon which the larger organisms such as shrimp and fish feed. It would appear to the Court that such language is sufficient to alert specialists in the various agencies which review the EIS to the particular problems raised by plaintiffs herein, with regard to the impact of the project on the food support chain of the shrimp, and the ultimate effect on the shrimp.

Moreover, throughout the EIS, notably at pages 13–14, ¶¶ 4.01, 4.02 and 4.05, the EIS discusses the turbidity caused by the dredge and fill activities, its effect on the benthic invertebrates which populate the project area, and the displacement of such organisms resulting from such activities. The EIS concludes however that repopulation of the areas by the displaced organisms will occur within a short period, and that the long term damage to marine life will be minimal. In fact, the statement reflects the opinion of the Corps, which was substantiated by the testimony at the hearing, that turbidity would be no greater than that caused by the natural storms which occur in the area, and that the effects of such turbidity would be only temporary.

In reviewing the section of the EIS containing the comments of the various agencies to which the EIS was submitted for approval (Pages 18–30), it is clear that the problems raised by the plaintiffs were recognized by the reviewing agencies, and made known to the Corps. By its responses to the comments, the Corps indicates the requisite awareness of the problems raised therein and proper consideration of such objections in making the final determination to proceed with the project.

In the opinion of this Court no more is required of the Corps in order to withstand the plaintiffs' attack on the sufficiency of the EIS. As was pointed out in *Sierra Club v. Morton, supra,* the EIS is sufficient if the "significant environmental effects were recognized and presented in the final statement in a way which afforded the decisionmaker an opportunity to properly weigh them." 510 F.2d at 820. The EIS under attack here "clearly brings the significant long-term environmental hazards and detriments to peer status with the present need and economic costs considerations which formerly would have controlled decisionmaking." *Id.* at 821

Moreover, the balancing of factors required in the Corps' final decision is clearly demonstrated in the EIS at ¶¶ 7.00 and 8.00 wherein it states that the long-term benefits of the project derived from the restora-

tion of the beaches for pleasure and recreation, stabilization of the marine life habitat, and protection to property and existing structures far outweigh the possible adverse impacts of temporary destruction of marine life in the project area, whether it be to benthic organisms, shrimp, or other species of fish. In fact, the Corps concludes that "no threat to any species inhabiting the project area is expected."

Finally, with regard to the plaintiffs' claim that the EIS fails to adequately measure the costs of such a project in terms of loss of shrimp production and effect on the local economy, the Court in *Morton, supra,* pointed out that a strict dollar and cent weighing of the costs and benefits of the proposed action was not required. 510 F.2d at 827. Rather, the Court held, an agency must follow procedures "reasonably calculated to bring environmental factors to peer status with dollars and technology in their decisionmaking." *Id.*

In this case, the Corps weighed on the one hand the rapidly deteriorating coastal beachfront along the Duval County shore (and here the Court takes judicial notice of the fact that the oceanfront and abutting property are among that which is environmentally endangered in the State of Florida and which it is the public policy of this state and nation to preserve), as weighed against damage to fish and marine life, which competent testimony has indicated would be relatively minor and of a temporary duration.

■ This Court therefore is compelled to conclude that the EIS in this case complies with the requirements of NEPA in sufficiently describing the possible adverse environmental impact of the proposed project on marine life in the target area. The Court therefore finds that the plaintiffs are not likely to prevail on the merits of this action, and no injunction should therefore issue.

Moreover, it appears that plaintiffs cannot satisfy the second prong of the test for a preliminary injunction as the Court fails to discern from the evidence presented that the plaintiffs will suffer irreparable damage if the injunction is not issued. On the contrary, the weight of the testimony credited by the Court is to the effect that any adverse effects on the shrimp population would be insignificant, and only temporary.

In addition, it is the opinion of the Court that damage to the defendants if the project is not permitted to proceed would far outweigh the possible injury to the plaintiffs if injunctive relief is denied. Despite the protestations of the plaintiffs that they are not interested in stopping the project, the Court is of the opinion that a temporary injunction would have such an effect for at least one more full year. In this respect the contention of the plaintiffs upon oral argument that according to the EIS the upcoming months represent a non-erosion weather cycle (and in fact result in a build-up of the beaches) and therefore no harm to the beaches would result by delaying the project, is not totally accurate. This is because the work to be accomplished in restoring the beaches must be done during a period when no storms and beach erosion is taking place. Therefore, if any delay is imposed, it would likely be another year before the project could again be undertaken, and another season of beach erosion would have elapsed. In the opinion of the Court such delay would result in harm too great to the defendants to allow the project to be halted by means of a preliminary injunction, especially in view of the minimal harm to be suffered by the plaintiffs.

Finally, the Court is further persuaded that the public interests lie with the defendants in this case. It is clear that if the project is not carried out, severe irreparable damage and loss to the property may result from continued erosion of the target beaches. Further, the threat to the plaintiffs' livelihood appears no more than de minimis at this time and therefore this factor also weighs in the defendants' favor and strongly mitigates against the entry of a preliminary injunction.

For the foregoing reasons, plaintiffs' motion for a preliminary injunction will be denied; and the temporary restraining or-

der previously entered and continued by this Court[2] will be vacated.

2. At the conclusion of the arguments of counsel on February 17, 1977, this Court ruled from the bench but announced that the temporary restraining order would remain in effect until the oral ruling had been reduced to a written opinion and order. A written order is being entered simultaneously herewith.