**OCEANPORT INDUSTRIES, INC., a Delaware Corporation, Appellee Below, Appellant,**

**and**

**Environmental Appeals Board of the State of Delaware, Appellee Below,**

**v.**

**WILMINGTON STEVEDORES, INC., a Delaware Corporation, Appellant Below, Appellee.**

Supreme Court of Delaware.

Submitted: April 13, 1993.

Decided: Jan. 26, 1994.

Rehearing Denied: Feb. 28, 1994.

Jeremy W. Homer (argued), Parkowski, Noble & Guerke, P.A., Dover, for appellant Oceanport Industries, Inc.

John J. Schreppler, II (argued), Bayard, Handelman & Murdoch, P.A., Wilmington, for appellee Wilmington Stevedores, Inc.

Steven C. Blackmore, Dept. of Justice, for Environmental Appeals Bd.

Before VEASEY, C.J., HORSEY and MOORE, JJ.

MOORE, Justice.

We accepted this interlocutory appeal by Oceanport Industries, Inc. ("Oceanport") from a decision of the Superior Court, reversing a decision of the Environmental Appeals Board (the "Board" or "EAB"). The Superior Court ruled that, pursuant to 7 Del.C. §§ 6008(a) and 7210, Wilmington Stevedores, Inc. ("WSI") had standing to appeal the issuance of environmental permits to Oceanport by the Secretary of the Department of Natural Resources and Environmental Control ("DNREC" or "Department"). Additionally, the Superior Court remanded the case to the EAB with instructions to remand in turn to the Secretary of the DNREC for a review of the status of Oceanport's project under the Coastal Zone Act ("CZA"), 7 Del.C. §§ 7001–7013.

The issue of standing is one of first impression, as is the scope of the EAB's jurisdiction in matters pertaining to the CZA. We conclude that the Superior Court erred in determining that WSI has an interest that is substantially affected by the Secretary's decision. With regard to the remand to consider the CZA status decision, the Superior Court confused the application of the CZA, found in Title 7, Chapter 70, of the Delaware Code, to the issuance of permits granted under the authority of Chapters 60 and 72. Accordingly, we reverse.

I.

*The Parties*

Oceanport, a Delaware corporation, is a wholly owned subsidiary of Granite State Minerals, Inc., a New Hampshire corporation. Oceanport is engaged in the business of off-loading, storing, and transferring bulk products.

WSI is a corporate citizen and taxpayer of the State of Delaware, engaged in the stevedoring business at the Port of Wilmington. WSI does not own or control the Port, which is owned and operated by the City of Wilmington. WSI contracts to use the Port's facilities, which are open to Oceanport and all others who wish to do business there. WSI currently competes with Oceanport at the Port of Wilmington.

*The Oceanport Facility*

The Oceanport terminal is located in the coastal zone at Claymont, Delaware, approximately six miles north of Wilmington. The site occupies 46.9 acres with eight hundred feet of frontage on the Delaware River. Once known as the Paragon Oil Petroleum Tank Farm, Texaco began operations at the site in 1905. The property includes petroleum storage tanks and a wooden pier extending 740 feet into the Delaware River, which have been used for the off-loading and storage of petroleum for at least thirty-five years. Oceanport purchased the site from Texaco in September 1986, and has operated it since that time.

The area surrounding the Oceanport facility is zoned for heavy industrial use. Airco is on the southwest; Citisteel is next to Airco on the south; General Chemical abuts on the northeast; and the manufacturing facility and pier of the Allied Chemical Company is to the immediate north.

*The Coastal Zone Status Decision*

The CZA prohibits the construction of new bulk product transfer facilities outside of the Port of Wilmington, 7 Del.C. §§ 7002(f) and 7003. However, a bulk product transfer facility in operation on June 28, 1971 constitutes a non-conforming use and is not subject to the CZA prohibition. *Id.* Although Texaco had obtained non-conforming use status

for the facility in 1972, Oceanport sought a new determination that its proposed use of the facility constituted the continuation of a non-conforming use.

On May 14, 1987 Oceanport requested a Coastal Zone Status Decision, an administratively created mechanism for the determination of whether or how proposed projects are regulated by the CZA. Oceanport requested a finding that its facility was exempt from the CZA as a docking facility or pier for a single industrial facility under 7 Del.C. 7002(f), or alternatively, that the site and its proposed use constituted a bulk product transfer facility which was in operation on June 28, 1971, and was therefore a non-conforming use under Sections 7003 and 7002(f).

In the application, Oceanport proposed to use the property to off-load and store solid bulk product, such as road salt, crushed stone, cement, and other non-toxic products. Oceanport indicated that it would reduce 25% of the oil storage capacity of the facility, including a cluster of eight tanks closest to the water, and remove two pipelines from the pier, to be replaced with a conveyor belt for the solid bulk products. Although the application indicated that the substitution of the conveyor belt for the pipelines would not in and of itself result in a restructuring, reconfiguration or widening of the existing pier, it also stated that the existing pier would be extended and improved to eliminate the need for frequent dredging.

On June 25, 1987, the Secretary of the DNREC issued a status decision which determined that the proposal was not governed by the Coastal Zone Act. In making the determination, he made three findings about the proposed project:

1. Because the use of the site as an offshore bulk product transfer facility predates enactment of the Coastal Zone Act, the facility enjoyed nonconforming use sta-

tus at the time the Coastal Zone Act was enacted.

2. The use of the site as an offshore bulk transfer facility had continued to the present despite the temporary decrease in transfer operations caused by the pier fire in May 1987.

3. The proposed modifications did not constitute a significant expansion or extension since there would be no significant increase in production capacity (no production/manufacturing existed), no significant increase in land area encompassing the proposed operation, and no significant increase in environmental impact.

The three-part test applied in the status decision to the proposed modifications is derived from the regulatory definition of "expansion or extension" of non-conforming uses under the CZA.[1]

The status decision was not appealed by WSI or any other entity and, according to its terms, became final fourteen days following the date of the legal notice of the decision.

*The Consent Decrees*

Thereafter, Oceanport started work on the pier. On November 10, 1988, DNREC filed a complaint in the Superior Court against Oceanport, alleging that on September 29, 1988, the Department discovered a project involving "the construction, modification, repair or reconstruction" of an industrial pier without the appropriate permits for the work in private subaqueous lands. On the same day Oceanport executed a consent decree with DNREC, agreeing to submit the appropriate permit application in accordance with 7 Del.C. § 7205. In return, the consent agreement authorized work to continue without the permit, but with strict guidelines on the physical size of the pier. Additionally, the DNREC reserved the right to order the removal of portions of the pier in the event the DNREC later determined they were unstable or environmentally unsound.

---

1. The applicable Coastal Zone Administrative Regulation states:

In order to clarify the types of actions covered by the term "expansion or extension" of non-conforming uses, this term is defined as follows:

"Expansion or Extension" means a change of existing processes, facilities or buildings which significantly increases the production capacity, land use area or environmental impact.

On December 18, 1990, DNREC filed another complaint in Superior Court against Oceanport, alleging that Oceanport had constructed a conveyor system and hopper on the pier over public subaqueous lands in the Delaware River. The same day, a second consent agreement was filed, which imposed a $20,000 fine against Oceanport and provided that Oceanport was not to conduct any commercial activity on the pier until such time as the DNREC permits were issued.

### Permit Applications and Hearing Process

On November 28, 1988, Oceanport filed its application for the permit to undertake the pier improvements in subaqueous lands pursuant to 7 *Del.C.* § 7205. Following revisions to the application at DNREC's request, public hearings were held on March 7 and 15, 1989. During these hearings, the Department determined that Oceanport's application was incomplete and that no final decision could be reached without additional information. As a result, the hearing process was suspended to allow Oceanport an opportunity to amend its presentation after consultation with the DNREC on what was needed to cure the deficiencies.

That process continued for nineteen months until October 1990, when the hearings resumed. Before the hearing resumed, the second consent decree was executed regarding the requirement of an air discharge permit to construct the conveyor and other solid bulk product transfer equipment on the pier, which had created the potential for fugitive air emissions. The scope of the hearing was expanded to include a permit pursuant to 7 *Del.C.* § 6003 to discharge stormwater runoff into the Delaware River (the "NPDES" permit), and a permit pursuant to 7 *Del.C.* § 6003 to construct a bulk product transfer facility.

The public hearing on all the permits was held on November 18, 19 and 30, 1990, and concluded on December 13, 1990. The outcome of the hearing was mixed for Oceanport. On one hand, the hearing officer found that in its request for the Coastal Zone Status Decision, Oceanport did "not fully disclose the details of the project...." On the other hand, the hearing officer noted that "Oceanport made a strong technical case in support of its various permit applications."

Ultimately, however, the hearing officer concluded that the two consent decrees estopped the DNREC from denying the permit request or reopening the status decision. The Secretary of DNREC adopted the report of the hearing officer, and granted the permit requests on July 12, 1991.[2]

### Appeal to the EAB

Pursuant to 7 *Del.C.* §§ 6008 [3] and 7210,[4] WSI and the Delaware Audubon Society ("Audubon"), appealed the issuance of the permits to the Delaware Environmental Appeals Board ("EAB"). Oceanport moved to dismiss the appeals principally on the grounds that WSI and Audubon lacked standing and that the EAB lacked subject matter jurisdiction to consider certain issues related to the CZA. In an opinion dated November 1, 1991, the EAB dismissed the

---

2. The permits include:

 1) A permit issued pursuant to 7 *Del.C.* § 6003 and the State of Delaware Regulations Governing the Control of Air Pollution, to construct a bulk product transfer facility consisting of a clam shell bucket crane, a self-enclosed belt conveyer, and discharge hoppers;

 2) A permit issued, pursuant to 7 *Del.C.* § 6003, to discharge stormwater runoff, steam condensate and boiler blowdown through a separator into the Delaware River (the "NPDES" permit); and

 3) A permit, pursuant to 7 *Del.C.* § 7205, to construct portions of a pier in private subaqueous lands. The lease of subaqueous lands is for the construction of portions of the pier in public subaqueous lands.

3. 7 *Del.C.* § 6008(a) states in pertinent part:

> Any person whose interest is substantially affected by any action of the Secretary may appeal to the Environmental Appeals Board within 20 days after receipt of the Secretary's decision or publication of the decision.

4. 7 *Del.C.* § 7210 states in pertinent part:

> Any person whose interest is substantially affected by any action of the Secretary or of the Department taken pursuant to this chapter, may appeal to the Environmental Appeals Board as established by § 6007 of this title within 20 days after the announcement of the decision.

WSI appeal on the basis of lack of standing, and denied dismissal of the Audubon appeal.[5]

With regard to standing, the EAB ruled that an appellant's interest should be distinguishable from those interests shared by the public in general. It stated:

> WSI has not alleged any facts which identify how a failure to appropriately regulate these environmental issues will affect its commercial or other interest. At oral argument, WSI did state that it had a maritime interest in maintaining the navigability of the Delaware River in the event of a spill. The Board finds this interest more remote than that contemplated by the statute.

With regard to WSI's claim that it sought to maintain a level competitive playing field by insuring Oceanport's compliance with the CZA and the status decision, the EAB stated that "the entire thrust of the WSI complaint clearly indicates that the complaint belongs before the Coastal Zone Industrial Control Board and not the Board."[6]

*Appeal to the Superior Court*

WSI appealed the EAB decision to Superior Court. In an order dated October 7, 1992, the Superior Court ruled that WSI has "a legitimate interest in the preservation of water quality in the Delaware Bay" that is substantially affected by the Secretary's ruling, and thus had standing to challenge the permits on appeal to the EAB. The decision also remanded the case to the EAB and directed the EAB to remand the matter to the Secretary of DNREC "for a review of the status of this project under the CZA."

## II.

■ We first address the question whether WSI has standing in this case. That issue is a mixed question of law and fact. Whether the Superior Court correctly interpreted the applicable standing provisions is a question of law, which this Court reviews *de novo. Fiduciary Trust Co. v. Fiduciary Trust Co.,* Del.Supr., 445 A.2d 927 (1982). To the extent that this appeal involves a factual determination whether WSI meets the legal test of standing, the Court determines whether substantial evidence supports the findings below. 7 *Del.C.* § 6009. "Substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Olney v. Cooch,* Del.Supr., 425 A.2d 610, 614 (1981).

This is a case of first impression before us. The statutes involved, 7 *Del.C.* §§ 6008 and 7210,[7] govern the standing of those who wish to challenge the actions of the Secretary or the DNREC under either Chapter 60 or 72 of Title 7. According to the terms of the standing provisions, an appellant must have 1) an interest that is 2) substantially affected by an action of the Secretary or the DNREC. This Court has not previously interpreted either provision.

*General Principles of Standing*

■ The Superior Court rejected the EAB's ruling that an appellant's interest in a DNREC decision must be distinguishable from the interest shared by the public in general. Under traditional standards, a law that creates a duty to the general public does not give rise to privately enforceable rights. *See, e.g. Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975); *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). However, after reviewing several cases, the Superior Court determined that "[t]he law [has] moved away from the strict requirement that a party asserting a claim must assert an injury that differs from that received by the public at large." In so concluding, the court distinguished two

---

5. Audubon is not a party to the appeal before us. Thus, we do not address issues of its standing below.

6. As the Superior Court discussed in its decision: The Board's problem arose because there is a split of appellate authority; appeals from decision of the Secretary [of the DNREC] regarding the coastal Zone Act are directed to one Board, the coastal Zone Industrial Control Board, and appeals from decisions of the Secretary regarding permits of the type at issue here are directed to a different Board, the Environmental Appeals Board. Quite naturally the Environmental Appeals Board considers it beyond the scope of its authority to review the CZA determination.

7. Because both 7 *Del.C.* § 6008 and 7210 use the "substantially affected" language, we will refer to them in concert as the "standing provisions."

Delaware Supreme Court cases that as a general matter required a heightened interest to achieve standing.

First, in *Stuart Kingston, Inc. v. Robinson*, Del.Supr., 596 A.2d 1378 (1991), this Court held that in order to achieve standing, a plaintiff must have an interest distinguishable from the greater public. Specifically, the Court noted:

The concept of "standing," in its procedural sense, refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance. It is concerned only with the question of who is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy. In order to achieve standing, the plaintiff's interest in the controversy must be distinguishable from the interest shared by other members of a class or the public in general. Unlike the federal courts, where standing may be subject to stated constitutional limits, state courts apply the concept of standing as a matter of self-restraint to avoid the rendering of advisory opinions at the behest of parties who are "mere intermeddlers."

*Id.* at 1382 (citations omitted). Because *Stuart Kingston* involved a private contract dispute not involving public property, the Superior Court determined that the foregoing discussion was irrelevant here.

Second, this Court has discussed standing in *Gannett Co., Inc. v. State*, Del.Supr., 565 A.2d 895 (1989). In *Gannett*, we held that "[t]he test of standing is whether: 1) there is a claim of injury-in-fact; and 2) the interest sought to be protected or regulated by the statute or constitutional guarantee in question." The Superior Court distinguished *Gannett* on the grounds that it was based on a constitutional, not statutory, analysis.

■ The language cited above from *Gannett* is derived from the United States Supreme Court case of *Assoc. of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153–54, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). An interest is sufficient for the purposes of standing if "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional

guarantee in question." *Id.* Based upon this plain language, the general test laid out in *Data Processing* applies to statutes as well as constitutional inquiries.

*The Statutory Scheme*

■ While the general principles of standing are helpful in determining WSI's status, the real determinant is the statutory language itself, for no party has a right to appeal unless the statute governing the matter has conferred a right to do so.

■ The relevant statutes do not define the term "substantially affected." The General Assembly passed the pertinent statutes as a whole and not in parts or sections. Consequently, each part or section should be read in light of every other part or section to produce an harmonious whole. *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, Del.Supr., 492 A.2d 1242, 1245 (1985). Undefined words in a statute must be given their ordinary, common meaning. *Id.* Additionally, words in a statute should not be construed as surplusage if there is a reasonable construction which will give them meaning, *Matter of Estate of Smith*, Del.Ch., 467 A.2d 1274, 1280 (1983), and courts must ascribe a purpose to the use of statutory language, if reasonably possible. *In re Estate of Webb*, Del.Ch., 269 A.2d 413, 416 (1970), *aff'd*, Del.Supr., 276 A.2d 457 (1971).

The General Assembly provided a role for the participation of the general public in the protection of natural resources by establishing a minimal standing requirement for involvement in hearings during the permit process. Pursuant to 7 *Del.C.* § 6004(b) and 7 *Del.C.* § 7207(d), any citizen can obtain a hearing before the Secretary on a proposed permit by submitting a "meritorious request," which in the case of section 6004(b), is defined as "a familiarity with the application and a reasoned statement of the permit's probable impact."

After the hearing process is complete and the Secretary has made a decision on the permits, the standing requirement changes. It then becomes the more stringent "substantially affected" test of the standing provisions at issue here. Based on the foregoing,

it seems clear that the General Assembly intended a stricter standing requirement for appeals to the EAB or under the CZA than for that of the hearing process, which is open to the informed general public.

 This conclusion overrules the Superior Court's broader interpretation of the term "substantially affected." Citing the purpose of the protection of the environment for the benefit of the public interest, the court ruled:

> In light of the stated strong policy of preserving the environmental integrity of the natural resources of this State for the benefit of the public, it is clear that an erroneously issued permit could substantially affect the interests of the Delaware citizens in the preservation of publicly owned natural resources.... [D]ue to the fact that WSI is a corporate citizen with a legitimate interest in the preservation of water quality in the Delaware Bay, I find WSI's interests to be "substantially affected" by the Secretary's ruling so as to accord it standing to challenge the issuance of the [permits].

The court correctly noted that WSI has an interest in the issuance of the permits, but the court expanded the application of "substantially affected" to effectively include "the interests of the Delaware citizens in the preservation of publicly owned resources." On this basis, the term "substantially affected" becomes superfluous, and thus violates a rule of statutory construction that specific provisions should prevail over general provisions. *See Mergenthaler v. State,* Del.Supr., 239 A.2d 635, 637 (1968).

8. A portion of this provision states:
In view of the rapid growth of population, agriculture, industry and other economic activities, the land, water and air resources of the State must be protected, conserved and controlled to assure their reasonable and beneficial use in the interest of the people of this State. Therefore, it is the policy of the State that:
(1) The development, utilization and control of all the land, water, underwater and air resources shall be directed to make the maximum contribution to the public benefit;

9. This provision states:
This chapter, being necessary for the welfare of the State and its inhabitants, shall be liberally

*The Interest of WSI*

WSI has asserted that it has both economic and environmental interests at stake in this appeal, which are being jeopardized by the Secretary's issuance of the permits to Oceanport. In order to satisfy the first part of the standing provision, the Court must determine whether WSI's economic and environmental interests are of the type protected by Chapters 60, 70 and 72.

 The paramount consideration of Chapter 60, and presumably Chapters 70 and 72, is the protection of the environment. *State v. Getty Oil Co.,* Del.Super., 305 A.2d 327, 329 (1973). The Superior Court cited 7 *Del.C.* §§ 6001(b),[8] 6020,[9] and 7201 [10] for the underlying purpose of environmental protection in the public interest. It is evident from the foregoing that these Chapters were designed to protect environmental interests, including those of both WSI and Oceanport. Clearly then, WSI, as a corporate citizen of the State, has an interest in the protection of its natural resources.

Likewise, WSI has a stated economic interest involved in this case. WSI's most obvious economic interest is the deterrence of competition that would follow upon denial of operating permits to Oceanport. Because the stevedoring business depends on navigable waters, WSI also has an economic interest in seeing that the Delaware River remains open and free from any environmental damage that might prevent WSI from operating. Arguably, Section 6001(a)(1) contemplates this interest by stating: "The development, utilization and control of the land, wa-

construed in order to preserve the land, air and water resources of the State.

10. A portion of this provision states:
Subaqueous lands within the boundaries of Delaware constitute an important resource of the State and require protection against uses or changes which may impair the public interest in the use of tidal or navigable waters. The purposes of this chapter are to empower the Secretary to deal with or to dispose of interest in public subaqueous lands and to place reasonable limits on the use and development of private subaqueous lands, in order to protect the public interest....

ter, underwater and air resources of the State are vital to the people in order to assure adequate supplies for domestic, industrial, ... and other beneficial uses...." So from an economic standpoint as well, WSI can demonstrate an interest in the issuance of permits to Oceanport by the Secretary. None of the foregoing circumstances, however, are legally sufficient to end our inquiry into the standing of WSI to challenge the Secretary's actions.

In environmental law litigation, standing issues are presently the most contentious being adjudicated. This case presents the Court with exactly that issue—whether WSI has standing to challenge the issuance of permits for pier improvements in publicly owned subaqueous lands (7 *Del.C.* § 7205), for fugitive air emissions (7 *Del.C.* § 6003), and for point source discharge into the Delaware River under the National Pollutant Discharge Elimination System (NPDES) (7 *Del.C.* § 6003) to Oceanport, see page 1.

*Organizational Standing*

 WSI asserts standing based upon 1) claims made on behalf of its employees, and 2) claims alleged on its own behalf. To have standing to assert the claims on behalf of its employees, WSI must first meet the threshold requirement of showing organizational standing. This is a special standing requirement imposed upon organizations who are suing on behalf of their members.[11]

 An organization may sue on behalf of its members if 1) the interests to be protected by the suit are germane to the organization's purpose; and 2) neither the claim asserted nor the relief requested requires the participation of individual members; and 3) the organization's members would otherwise have standing. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53

L.Ed.2d 383 (1977). The question whether one's interest is germane is "undemanding" and requires only "mere pertinence between the litigation subject and organizational purpose." *Humane Soc. of the United States v. Hodel*, 840 F.2d 45, 58 (D.C.Cir.1988). This is a weak standard, barring only those whose litigation goals and organization's purpose *are totally unrelated. Id.* Arguably, a purpose, if not duty, of WSI is to protect its employees from injurious environmental conditions. Thus, it satisfies this part of the test.

The second part of the organizational standing test requires member participation in the suit to be unnecessary, and likewise is satisfied here. WSI is not claiming monetary damages, or seeking other relief in which its employees would be actively affected by a positive disposition. Rather, WSI challenged the issuance of permits, the ultimate objective of which is to ensure that the Secretary has lawfully complied with his duties. WSI's members are not needed to testify in the case or otherwise participate to allow the court to adjudicate the issues on their merits. WSI also has satisfied this part of the test.[12]

The third part of the organizational standing test, which requires that the organization's members also have standing, has not been met by WSI. In such circumstances the *Data Processing* test is normally applied to assess injury in fact and zone of interest. *See generally, Overseas Shipholding Group v. Skinner*, 767 F.Supp. 287 (D.D.C.1991). However, such an analysis is not necessary here, because WSI's organizational standing claim fails on another ground under this part of the test.

 WSI claims that its standing is conferred by the potential injury to its members. This issue was first raised in this

---

**11.** It is manifest that this doctrine applies to this issue. Organization and member are not to be construed in a narrow sense as applying only to the most common situation where an organization is comprised of dues paying members or those who have affirmatively "joined" the group, such as the Sierra Club or a political group. Rather, it is to be given broad definition to apply to corporations who are suing on behalf of their employees. This result has been validated by the

District Court for the District of Columbia in *Overseas Shipholding Group, Inc. v. Skinner*, 767 F.Supp. 287 (D.D.C.1991) and remains unchallenged.

**12.** The District Court for the District of Columbia reached the same conclusion in the corporate organizational standing case of *Overseas Shipholding Group*, 767 F.Supp. 287.

Court, and therefore is not properly before us since it was not presented below. *City of Wilmington v. Spencer,* Del.Supr., 391 A.2d 199 (1978). As a result, we consider the issue waived, and it will not be considered by the Court. *Id.*[13]

■■■■■■ As an additional ground for standing, WSI asserts that the organization itself has been or will be injured.[14] As to this issue WSI need not meet the organizational standing test, because an organization may have standing in its own right where it has alleged some injury to its own interests. *Overseas Shipholding Group,* 767 F.Supp. at 292.

### Relevance of Data Processing Test

■■■■ Under the *Data Processing* test, standing is conferred where there is "1) a claim of injury in fact; and 2) the interest sought to be protected is arguably within the zone of interest to be protected or regulated by the statute...." *Gannett,* 565 A.2d at 897 (citing *Data Processing,* 397 U.S. at 153–154, 90 S.Ct. at 829–30). Normally, this test applies only in the absence of a specific statutory grant of review. *United States v. Richardson,* 418 U.S. 166, 194, 94 S.Ct. 2940, 2955, 41 L.Ed.2d 678 (1974) (Powell, J., concurring opinion); *Presidio Bridge Co. v. Sec. of State,* 486 F.Supp. 288 (W.D.TX.1978).

In this case, the pertinent Delaware statutes contain specific standing provisions which require the party who wishes to appeal a decision of the Secretary of the DNREC to have an interest which is "substantially affected." [15] However, neither of the standing provisions define the term "substantially affected." This is of crucial importance because the definition will ultimately confer or deny standing to a party. It therefore falls to us to give body to the phrase "substantially affected."

In a similar case, *Agrico Chemical Co. v. Dept. of Environmental Regulation,* Fla. App., 406 So.2d 478 (1981), the Florida District Court of Appeals for the Second District interpreted the following language of *Fla. Stat.* 120.52(10)(b): "Party means ... (b) any person ... whose substantial interests will be affected by proposed agency action...." *Id.* at 482. In that case, several corporate parties who were economic competitors of Agrico wished to intervene in the process through which Agrico was to be granted a permit for the construction of a fertilizer facility. *Id.* at 478–480. The corporate parties were granted standing by the Hearing Board, but the District Court of Appeals reversed, holding that the phrase "substantial interests will be affected" required a showing of 1) an injury in fact, and 2) that the interest sought to be protected was within the zone of interest protected under the

---

**13.** Even if we ruled otherwise, and considered this issue, WSI cannot prevail. As will become apparent under the *Data Processing* test analysis to follow, WSI has not provided this Court with affidavits or other specific evidence showing that its members actually use the Delaware River and would be affected by the Secretary's decision. In short, WSI has failed to show that one or more of its members would be directly affected by the Secretary's decision. *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2133, 119 L.Ed.2d 351 (1992). A bald assertion of fact without proof, such as affidavits, will not carry WSI's burden of proving injury in fact sufficient to establish standing. *See id.* at ——– ——, 112 S.Ct. at 2137–2138.

**14.** In instances where the environmental law is designed to prevent the occurrence of environmental degradation, it is sufficient to show that the injury may or will occur at some future date. This is the case in National Environmental Policy Act litigation because the act is designed to prevent environmental degradation. Thus, future environmental degradation is within the zone of interest sought to be protected by the Act. Obvi-

ously, then, whether a contingent or future occurrence of an act is sufficient to confer standing is determined by the *Data Processing* test.

In the context of the Coastal Zone Act, 7 *Del.C.* §§ 7001–7013, and the Subaqueous Lands Act, 7 *Del.C.* 7201–7216, under review here, the future occurrence of environmental degradation is clearly within the zone of interest sought to be protected by the acts. The Coastal Zone Act, 7 *Del.C.* § 7001, states as its purpose the protection of the coastal zone. Likewise, the Subaqueous Lands Act, 7 *Del.C.* § 7201, states as its purpose the protection of subaqueous lands against use or change not in the public interest. It would be inconsistent to exclude the future occurrence of events from the scope of these acts, because one cannot prevent environmental degradation after it has already occurred. Thus, WSI's claims relating to present or future injuries under the relevant laws are within the zone of interest as enunciated in the *Data Processing* test.

**15.** *See supra,* notes 3 and 4.

statute. *Id.* at 478–482. Thus, the *Agrico* court in interpreting a phrase most similar to the "substantially affected" phrase with which this Court is now concerned, employed the *Data Processing* test, although not by name or reference.

There is a logical strength to the application of *Data Processing* to the present case independent of *Agrico*. By enacting the standing provisions, the General Assembly adopted an appeals standard requiring a heightened interest. It seems clear that the intent of the legislature was to limit standing to appeal to those who were actually affected by the Secretary's decisions. It seems equally clear that the General Assembly did not open the flood gates to anyone who merely claimed an interest in the matter. That would have created a totally unworkable administrative structure.

■ In supplying the necessary interpretation of the term "substantially affected," we adopt the *Data Processing* test because it gives meaning to the obvious intent of the General Assembly. *In the Matter of Estate of Smith*, Del.Ch., 467 A.2d 1274, 1280 (1983). A party who is required to show an injury in fact, and that such injury is within the zone of interest sought to be protected by the statute, clearly comes within the purview of these statutes. Determining standing by such criteria complies with the legislature's goal of administrative workability. Thus, in the absence of any legislative definition of the term "substantially affected", the *Data Processing* test provides a workable and just interpretation.

*Application of Data Processing And Its Progeny*

The refinement of the *Data Processing* test has had a long and varied history. How-ever, the United States Supreme Court has clearly enunciated the definitive statement on its application in *Lujan v. Defenders of Wildlife*, —— U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).[16] In *Lujan* the Court folded the first two parts of the *Data Processing* test into one, and held that two additional criteria had evolved. *Id.* at ——, 112 S.Ct. at 2136. First, a party must have suffered an injury in fact, which is the invasion of a legally protected interest within the zone of interest sought to be protected or regulated by the statute. *Id.* at ——, 112 S.Ct. at 2136. The invasion must be 1) concrete and particularized, and b) "actual or imminent, not 'conjectural' or 'hypothetical'" *Id.* at ——, 112 S.Ct. at 2136 (citations omitted). Second, "there must be actual connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'"[17] *Id.* at ——, 112 S.Ct. at 2136 (citations omitted). Finally, it must be likely that the injury will be redressed by a favorable decision, rather than merely speculative. *Id.* at ——, 112 S.Ct. at 2136.

Here, WSI fails the first part of the standing test as to an injury in fact and its zone of interest. In reaching this conclusion we consider the facts pleaded by the party asserting standing. WSI contends first that it has an "interest in water quality and navigation." (App.Br. at 3). More specifically, WSI states that it is concerned about surface water runoff, the effects that dredging might have on water quality in the Delaware River, and fugitive air emissions from the Oceanport site. (App. Appendix at 4). WSI has filed

**16.** The references in WSI's brief to *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (commonly known as SCRAP I), and *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), as controlling law in the area of environmental standing, are misleading and incorrect. These cases have long been called into question, and narrowed to the point of invalidation. *Whitmore v. Arkansas*, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *Lujan v. National Wildlife Federation*, 497 U.S.

871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Lujan v. Defenders of Wildlife*, —— U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

**17.** Thus, WSI misstates the law when it claims that "Under *Duke Power*, WSI is not required to show that there is some nexus between its alleged injury . . . and the claim on the merits." (App.Br. 22) As previously stated, *Duke* is old law and *Lujan*, which was decided well before WSI's brief was due in this Court, makes that point perfectly clear.

no affidavits or other documents providing further details about its first standing claim.

WSI's second claim is that the increased oil tanker traffic caused by the opening of the Oceanport facility will increase the likelihood of an oil spill. (App.Br. 4). WSI is concerned that such a spill would close the Delaware River to shipping traffic, and thereby cause economic damage to its interests. (App.Br. 3). WSI specifically asserts that the Oceanport facility will also increase the likelihood of any kind of shipping accident, which could close the Delaware River and cause economic damage to WSI. (App. Br. 3–4).

Oceanport urges us to deny standing to WSI based upon its claims of both environmental and economic injury. Oceanport asserts that such alleged injuries in an environmental case automatically divest a party of standing. Federal case law is clearly to the contrary, and we adopt it. That, however, does not advance WSI's position.

▬▬ A party's asserted claim to standing may include both economic and environmental injuries, and a pecuniary interest will not defeat standing where there is a bona fide environmental claim. *Overseas Shipholding Group,* 767 F.Supp. 287, 292; *See also Pack v. Corps of Engineers,* 428 F.Supp. 460 (M.D.Fla.1977). "Courts should be reluctant to dissect a plaintiff's motivations for bringing a ... claim. 'It is not part of [the] court's function to weigh or proportion' conflicting monetary and environmental interests." *Id.* at 295 (citing *National Helium Corp. v. Morton,* 455 F.2d 650, 655 (10th Cir.1971)). On the other hand, "courts should deny standing to businesses asserting ... claims only when 'the companies are motivated solely by protection of their own pecuniary interest *and* [ ] the public interest aspect is so infinitesimal that it ought to be disregarded altogether.'" *Id.* at 295 (citing *National Helium,* 455 F.2d at 655) (emphasis added).

In this case, it is clear that the persuasive federal case law will not divest WSI of standing based simply upon a mixed claim of injury. The real issue is whether WSI's interests are sufficient to confer standing.

▬▬ Considering WSI's environmental claim first, it is clear the asserted injury is not sufficiently specific to withstand challenge. Thus, WSI's claim of environmental injury fails subpart (a) of the first part of the standing test—that the alleged injury must actually affect the plaintiff in a personal and individual manner. The mere allegation of a sincere interest in an environmental problem is not sufficient to confer standing. *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). In order to comply with the *Sierra Club* mandate, the party claiming standing must show that the alleged environmental injury will actually affect it. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).[18]

▬▬ WSI's second claim is based on pecuniary loss. While it may satisfy the injury in fact test, it fails the zone of interest test. WSI has alleged that it will suffer a particularized and concrete injury—that increased shipping traffic on the Delaware River will lead to a greater likelihood of a spill closing the River to shipping traffic, and that such closure will cause it a pecuniary loss. Clearly, such an injury, if it occurs, would have a direct impact upon WSI, thereby satisfying subpart (a) of the first part of a standing analysis.

▬▬ The claim also satisfies subpart (b) of the first part of the standing test. The claim is not conjectural or hypothetical. Although contingent, it is based upon the chance occurrence of some event which WSI has demonstrated will be appreciably increased by the opening of the Oceanport facility. It is not necessary for the event

---

18. In fact, the record suggests that WSI's environmental claims are weaker than those of the Sierra Club in *Sierra Club v. Morton.* For example, WSI has only actively pursued this course of action in the present forum. In the court below, the EAB, and before the Secretary, the record clearly illustrates that this environmental claim

played a very distant second fiddle to its main concern—pecuniary loss because of increased competition. Indeed, this issue received only cursory attention in all previous stages of the proceedings, and has only now come to the fore because WSI's standing has been seriously challenged under appropriate case law.

about which the plaintiff complains to have actually occurred; only that it not be so conjectural as to be more creative imagination than fact. *See Overseas Shipholding Group*, 767 F.Supp. 287.[19]

While WSI's claimed injury is not conjectural or hypothetical it plainly fails the zone of interest test. Thus, we examine whether "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute ... in question." *Data Processing*, 397 U.S. at 153–154, 90 S.Ct. at 829–830. Arguably, 7 *Del.C.* § 6001(a)(1) contemplates an economic interest: "The development, utilization and control of the land, water, underwater and air resources of the State are vital to the people in order to assure adequate supplies for domestic, industrial, ... other beneficial uses ..." However, this statement of purpose by the General Assembly does not place WSI's economic interest within the zone of interest of the statute.

It is indisputable that the goal of the relevant statutes is the protection of the environment. 7 *Del.C.* §§ 6001(b), 6020 and 7201. Each statute refers to the protection of natural resources and preservation of the environment as the main thrust of those acts. *Id.* The provisions of § 6001 quoted above do not even mention the protection of economic interests as a goal of the statute. 7 *Del.C.* § 6001(a)(1). Rather, it states that the goal of the statute is to preserve natural resources for beneficial uses, without defining such beneficial uses.

For this reason, the *Agrico* case is again instructive. *Agrico*, 406 So.2d 478. That case turned on whether it was appropriate for the Florida Department of Environmental Regulation to deny a construction permit. *Id.* In determining the appropriateness of the action, the court was required to interpret *Fla.Admin.Code Rule* 17–2.03(1)(A), which states, "1) In making the determination [of whether to issue a permit], the De-

partment shall give due consideration to ... (d) the social and economic impact...." Even in this case where the rule is more appreciably geared toward economic interests, the Florida Court of Appeal for the Second District found that an economic interest standing alone did not confer standing. *Id.* at 482–483.

That reasoning is sound. The statutes in question are designed to protect the environment, not economic interests. Reading the statutes as a whole, it would contravene the basic legislative intent to confer standing to challenge decisions made under those statutes based upon the sole claim of economic injury. Had WSI sufficiently asserted its environmental injury, or satisfied the elements of organizational standing, then the result might well be different. But WSI has not done so.

In summary, WSI has not satisfied organizational standing to proceed on behalf of its employees. Nor has it satisfied the injury in fact requirement for its environmental claim. Finally, WSI has not satisfied the zone of interest requirement for its economic claim.

### Conclusion

The Superior Court construed the standing provisions too broadly in determining that WSI had an interest that was "substantially affected" by the permit issued by the Secretary. The purpose of environmental regulation is to protect the public and ensure the environmental quality of our natural resources. In furtherance of that goal the General Assembly has established specific procedures for the resolution and enforcement of environmental disputes. This includes a role for the citizens for whose protection the statutes are designed. In this case, the Superior Court misapplied that framework and erroneously focused on the interest of WSI as the operative condition for standing, rather than on the question whether its valid interests were substantially af-

---

**19.** For example in the cited case, the District Court held that a shipping company had standing to challenge the government's approval of the use of VLC's. The company claimed the government had violated NEPA because the granting of permission constituted a major federal action substantially affecting the environment. The cor-

poration claimed the substantial impact on the environment was the increase in the likelihood of a major oil spill caused by the presence of these huge cargo ships. The court held this claimed injury was not conjectural or hypothetical, and that the corporation had standing. *Overseas Shipholding Group*, 767 F.Supp. 287.

fected by the decision of the Secretary. As a result, we conclude solely on standing grounds that WSI could not pursue the appeal to the EAB or the Superior Court.[20]

## III.

Thus, we turn to the question whether the Superior Court correctly remanded the case to the EAB, which was then directed to remand the matter to the Secretary of DNREC for a review of the status of Oceanport's project under the CZA. This involves an interpretation of Chapters 60 and 70, and thus is a matter of law reviewed *de novo. Fiduciary Trust Co. v. Fiduciary Trust Co.,* Del.Supr., 445 A.2d 927 (1982).

In addition to being generally responsible for the issuance of environmental permits under 7 *Del.C.* § 6003, the Secretary also is responsible for the issuance of permits with regard to subaqueous lands. 7 *Del.C.* § 7205. The purpose of these provisions is to protect the environment by controlling and abating pollution in the State. *See* 7 *Del.C.* § 6001. In discharging this responsibility, the Secretary must take into consideration the effects of the proposed project and any applicable regulations. *Id.* As such, this was the process in which the Secretary was engaged when he granted Oceanport the permits at issue here.

By contrast, the statutory purpose of the Coastal Zone Act, promulgated in Title 7, Chapter 70, of the Delaware Code is to prohibit the construction of new heavy industry along the coast, outside of the Port of Wilmington, 7 *Del.C.* § 7001, with the exclusion, however, of non-conforming uses in operation as of June 28, 1971. 7 *Del.C.* § 7004(a). If a non-conforming use is expanded or extended, the Secretary's permit powers and responsibilities are initiated. 7 *Del.C.* § 7005(a).

The Superior Court determined that before permits could be issued under Chapter 60, "the Secretary [had to] take a clear position as to whether or not the project as currently described violates the CZA." However, this confuses the statutory frame-

work and requirements of Chapters 60, 70 and 72. Although both Chapter 60 and the CZA are administered by DNREC, they have different purposes and requirements. There is no statutory requirement that a permit applicant obtain a favorable CZA status decision before applying for Chapter 60 permits. Similarly, when determining an applicant's status under the CZA, there is no requirement that the applicant have any status with regard to Chapter 60 permits. Although Oceanport received a CZA status decision from the Secretary, Delaware law does not compel concurrent compliance with regard to Chapter 60 permits.

Notwithstanding the difference in the statutory schemes, however, it is perhaps hypertechnical to treat them in isolation. In order to determine the correct posture with regard to both Chapter 60 permits and CZA status, in the future the Secretary should make the DNREC's position clear on an applicant's CZA status. As we noted, the Coastal Zone Industrial Control Board handles the appeals from decisions of the Secretary. 7 *Del.C.* § 7007(a). Thus, a remand to the EAB in the posture of this case was erroneous regarding a determination of Oceanport's CZA status.

Since WSI has no standing here, a further remand is unnecessary. The judgment of the Superior Court is REVERSED.

---

**20.** This renders moot the question whether WSI erroneously appealed to the EPA rather than the

Coastal Zone Industrial Control Board.