# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FRANCIS G. MARKERT JR., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | C.A. No. S22A-02-003 CAK |
| | ) | |
| BOARD OF ADJUSTMENT OF THE | ) | On Appeal from Decision of |
| CITY OF REHOBOTH BEACH; | ) | Board of Adjustment of the |
| AQUABA INVESTORS, LTD; | ) | City of Rehoboth Beach |
| JOHN N. PAPAJOHN TRUST; | ) | Dated January 24, 2022 |
| BELHAVEN INVESTMENTS, INC.; | ) | |
| and JOHN N. PAPAJOHN; | ) | |
| | ) | |
| Appellees. | ) | |

Submitted: September 8, 2022
Decided: September 26, 2022

*Verified Petition for Issuance of a Writ of Certiorari and Appeal for Judicial Review of the Decision of the Board of Adjustment of the City of Rehoboth Beach*

**AFFIRMED**

**MEMORANDUM OPINION AND ORDER**

William B. Larson, Jr., Esquire and Tye C. Bell, Esquire, Manning Gross + Massenberg LLP, 1007 North Orange Street, Suite 711, Wilmington, DE 19801, Attorneys for Appellant.

Richard A. Forsten, Esquire and Pamela J. Scott, Esquire, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899-1266, Attorneys for Appellees Aquaba Investors, Ltd., John N. Papajohn Trust, Belhaven Investments, Inc., and John N. Papajohn.

Frederick A. Townsend, III, Esquire, Hudson, Jones, Jaywork & Fisher, LLC, 34382 Carpenter's Way, Suite 3, Lewes, DE 19958, Attorney for Appellee Board of Adjustment of the City of Rehoboth Beach.


**KARSNITZ, R.J.**

## I.  INTRODUCTION

This case reveals the fault lines that sometimes exist between the requirements of an existing municipal zoning code and the evolving vision of the municipality for its future development.  The former may not have kept pace with the latter.  Nonetheless, zoning code requirements exist for a number of important reasons, and Delaware law carefully scrutinizes variances from those requirements.  The question before me is whether such a variance granted earlier this year – which may align with Rehoboth Beach's future development vision – also passes muster under the Rehoboth Beach zoning code under Delaware zoning and variance law.  In my view, it does, for the reasons articulated below.

## II.  FACTUAL AND PROCEURAL BACKGROUND

Appellant, Francis G. Markert, Jr. ("Appellant") is the owner of 520 New Castle Street, Ext., Rehoboth Beach, DE 19971, and a taxpayer and resident of the City of Rehoboth Beach (the "City").  The Board of Adjustment of the City (the "Board") is a five-member body appointed by the Mayor and Commissioners of the City, whose powers are specifically defined within the City zoning code (the "Zoning Code").  Aquaba Investors, LTD ("Aquaba") is the owner of Sussex County Tax Parcel 334-14.18-21.00. The John N. Papajohn Trust (the "Trust") is the owner of Sussex County Tax Parcel 334-14.18-20.00. Belhaven Investments, Inc. ("Belhaven") is the owner of Sussex

County Tax Parcel 334-14.18-35.00.[1] (These three tax parcels shall collectively be referred to as the "Property.") John N. Papajohn ("Papajohn") is the applicant before the Board (the "Applicant") and the principal of the entities that own the Property. (The Board, Aquaba, the Trust, Belhaven, and Papajohn, collectively, shall be referred to as "Appellees.")

On September 24, 2021, Applicant applied for a variance (the "Variance") in connection with the construction of a hotel on the Property. The application sought one area variance: a 50% variance of the Floor Area Ratio ("FAR")[2] from the authorized 2.0 FAR as authorized in the Zoning Code to a total of 3.0 FAR, an addition of approximately 38,475 square feet of gross floor area. The Board held a public meeting on November 22, 2021 to consider the application.

In advance of the public hearing, 116 residents, including Appellant, submitted detailed written comments opposing the Variance.

At the Board hearing, the following members of Applicant's team appeared as proponents of the Variance: Applicant, Applicant's attorney, Applicant's son, Applicant's architect, and Applicant's hospitality consultant. Several members of the

---

[1] These three tax parcels include 5, 7, 9, 13, and 14 Wilmington Avenue, Rehoboth Beach, DE 19971.
[2] Floor area ratio (FAR) is the measurement of a building's floor area in relation to the size of the lot/parcel that the building is located on. FAR is expressed as a decimal number, and is derived by dividing the total area of the building by the total area of the parcel (building area ÷ lot area). FAR is an effective way to calculate the bulk or mass of building volume on a development site, and a higher FAR indicates a greater building volume.

4

public appeared as opponents of the variance: a neighboring property owner expressed his concerns about the fire buffer and fire safety, a Planning Commissioner questioned whether Applicant should seek Planning Commission review,[3] and a City Planning Inspector stated that the variance could set a bad precedent for future development. Other members of the public opposed the project as "turning the CDP[4] on its head" and expressed the opposition of the Rehoboth Beach Homeowners Association (the "Association"), which represents hundreds of City homeowners. Yet other members of the public supported the project as consistent with the CDP.

At both the public hearing held on November 22, 2021, and in a written decision dated January 24, 2022, the Board voted 3 to 1 to grant the Variance. On February 23, 2022, Appellant filed a Petition for the Issuance of a Writ of Certiorari and an Appeal for Judicial Review of the Decision of the Board.[5] I issued the Writ of Certiorari the next day. On March 30, 2022, Appellees Aquaba, the Trust, Belhaven, and Papajohn filed their Response to the Petition. On May 24, 2022, the Board filed its record of the proceedings, including transcripts of the hearings held on October 25, 2021 and November 22, 2021. On June 22, 2022, the parties added an additional document to the record and stipulated and agreed to the documents constituting the record. Appellant filed

---

[3] The City Solicitor stated that such review was not required at the variance stage of the development process, and that the granting of a variance would not eliminate the need for the redevelopment project to go before the Planning Commission for site plan approval before a building permit was issued.

[4] 2010 Rehoboth Beach Comprehensive Dev. Plan ("CDP").

[5] Pursuant to 22 *Del. C*. § 328(a).

5

his Opening Brief on June 27, 2022. Appellees Aquaba, the Trust, Belhaven, and Papajohn filed their Answering Brief on July 21, 2022. The Board also filed its Answering Brief on July 21, 2022. Appellant filed his Reply Brief on August 3, 2022. I held oral argument on August 30, 2022. On September 8, 2022, the Board by letter submitted additional briefing at my request. This is my opinion on the Appeal.

## III. STANDING

With respect to an appeal to this Court from a Board decision:

> Any person or persons, jointly or severally aggrieved by any decision of the board of adjustment, *or* any taxpayer *or* any officer, department, board or bureau of the municipality may present to the Superior Court a petition, duly verified, setting forth that such decision is illegal, in whole or in part, specifying the grounds of the illegality. Such petition shall be presented to the Court within 30 days after the filing of the decision in the office of the board. [Emphasis supplied][6]

Appellant has the burden of establishing his standing.[7] He argues that he has standing both as a taxpayer and as an aggrieved person, although either status would be sufficient in and of itself.

Appellees, however, argue that Appellant lacks standing. First, Appellant has standing only when his "interest in the controversy [is] distinguishable from the interest shared by other members of a class or the public in general"[8] or within the "zone of interests to be protected or regulated by the statute in question."[9] Second, in accordance

---

[6] 22 *Del. C*. § 328(a).
[7] *Dover Historical Soc'y v. City of Dover Planning Comm'n*, 838 A.2d at 1109 (Del. 2002).
[8] *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991).
[9] *Dover Historical Soc'y*, 838 A.2d at 1111 (Del. 2002) (citing *Oceanport Indus., Inc. v. Wilmington*

6

with that basic rule, Delaware courts have dismissed appeals from boards of adjustment where appellant lacked standing even though appellant was a taxpayer. For example, in *Riverfront Hotel, LLC v. Board of Adjustment of City of Wilmington*,[10] a corporation owning a hotel appealed a landscaping variance granted by the Wilmington board of adjustment to another hotel. The corporation was a taxpayer, but its only other interest was that of an economic competitor of the hotel. The corporation made no allegations that any of its "interests" involved the purpose of the zoning laws in promoting health, safety, morals, or the general welfare of the community. Our Supreme Court held that neither a general public interest in lawfulness nor an interest in limiting competition were sufficient for standing in a zoning case.[11] To allow taxpayers standing in all such cases, argue Appellees, including those where taxation and spending are not at issue, would render the "aggrieved" component irrelevant.

Appellant argues that Appellees have ignored: 1) the genesis and history of Section 328(a) (which he briefed at length); 2) the plain language of that statute, which has been interpreted in favor of "taxpayer" standing without the addition of the "aggrieved person" component; and 3) relevant Delaware case law. He also distinguishes *Riverfront Hotel, LLC*. In the instant case, unlike *Riverfront Hotel, LLC*,

---

*Stevedores, Inc.*, 636 A.2d 892, 904 (Del. 1994)).

[10] 213 A.3d 89 (Del. 2019) (Table).

[11] In footnote 8 the Supreme Court stated that, although 22 *Del. C.* § 328 seemingly provides that "any taxpayer" may petition for review of a board of adjustment decision, it did not read § 328 to permit [the corporation] to bypass the ordinary test for standing in this case, which is one that "does not directly implicate taxation or spending."

7

Appellant is a natural person who alleges that Applicant's proposed hotel would negatively impact his health and safety, which the zoning code is designed to protect, including, among other ways, by increasing vehicle traffic, with an increased risk to Appellant's safety as a pedestrian. He also alleges that he is personally affected because the aesthetic benefit he enjoys under the zoning code, particularly for the iconic Rehoboth Boardwalk, will be diminished. The Board has conceded that the hotel would be located at an "iconic" location for City residents. Appellant had no anti-competitive purpose here, and seeks to protect his own personal interests and not simply the interests of the general public.

Appellant cites *Marriott Corporation v. Concord Hotel Management*,[12] in which our Supreme Court reversed the Superior Court's decision to overturn a board of adjustment's grant of a variance, but explicitly affirmed the Superior Court's ruling that the plaintiffs had standing (one appellant was a natural person, the other appellant was an artificial entity). As to standing, the Superior Court stated:

> It is a rule of statutory construction that where the language of the statute is clear and unambiguous, it must be held to mean what it clearly states. There is no reason to resort to statutory construction where there exists no doubt as to its meaning or where the language is unequivocal. The statute clearly grants standing to three categories of persons to challenge any decision of the Board, [including to] any taxpayer ….Based on the clear and unambiguous language of the statute, there is no room to argue that, as a taxpayer, plaintiffs lack standing…. [13]

---

[12] 578 A.2d 1097 (Del. 1990) (Table).

[13] *Concord Hotel Mgmt. v. Marriott Corp.*, 1989 WL 167403, at *3 (Del. Super. Dec. 28, 1989) (internal citations omitted).

8

I am persuaded that the Superior Court standing decision in *Marriott Corporation*, as expressly affirmed by our Supreme Court, indicates that *Riverfront Hotel* was not intended to *sub silentio* overrule *Marriott Corporation*'s approval of taxpayer standing.

In addition, standing for taxpayers *qua* taxpayers was recognized in *Wallace v Board of Adjustment of Odessa*,[14] where the Superior Court applied the clear language in Section 328(a) to find two natural persons had standing as taxpayers. No Delaware decision has rejected *Wallace*.

I find that Appellant has standing to bring this action both as a taxpayer and as an aggrieved person within the meaning of 22 *Del. C.* § 328(a).

## IV. STANDARD OF REVIEW

My review of Board decisions is limited to "the correction of errors of law" and determining "whether substantial evidence exists in the record to support the Board's findings of fact and conclusions of law."[15] Our Supreme Court has defined substantial evidence as "that which a reasonable mind might accept as adequate to support a conclusion. It is greater than a scintilla and less than a preponderance."[16] Substantial evidence is "a low standard to affirm, and a high standard to overturn."[17] Unlike the

---

[14] 1988 WL 97899 (Del. Super. Sept. 15, 1988).

[15] *Dexter v. New Castle County Bd. of Adjustment*, 1996 WL 658861, at *2 (Del. Super. Sept. 17, 1996), *aff'd*. 692 A.2d 414 (Del. 1997); *W & C Catts Family, L.P. v. Town of Dewey Beach*, 2018 WL 6264709, at *7-8 (Del. Super. Nov. 30, 2018) (citing *Janaman v. New Castle County Bd. of Adjustment*, 364 A.2d 1241 (Del. Super. 1976)).

[16] *Gala v. Bullock*, 250 A.3d 52, 69 (Del. 2021) (citations omitted).

[17] *Dover Land Holdings, LLC v. Kent County Bd. of Adjustment*, 2016 WL 3951699 (Del. Super. July

preponderance of the evidence standard, substantial evidence does not require a finding of "the greater weight of the evidence" for a particular party.[18]

However, the Board's discretion is not without limits. The Board may not "do whatever it thinks best without a factual basis in the record."[19] To enable me to fulfill my function of appellate review, "[t]he Board must particularize its findings of fact and conclusions of law in order to enable [me] to fulfill [my] function of appellate review."[20]

As part of the substantial evidence review, I "will not weigh the evidence, determine questions of credibility, or make [my] own factual findings."[21] I will defer to the Board's factual findings that are supported by substantial evidence.[22] I will uphold a decision supported by substantial evidence "even if such a court would have decided the case differently if it had come before it in the first instance."[23]

The burden is on the applicant to present sufficient evidence to warrant the granting of the Variance.[24] I must determine if the evidence is legally adequate to support the Board's factual findings.[25] After determining whether substantial evidence exists on the record to support the Board's decision and whether the Board's decision is

---

15, 2016).

[18] *Taylor v. State*, 748 A.2d 914 (Table) (Del. 2000).

[19] *Dexter,* 1996 WL 658861, at *2.

[20] *Id.* at *3.

[21] *New Cingular Wireless PCS v. Sussex County Bd. of Adjustment*, 65 A.3d 607, 610 (Del. 2012) (citation omitted).

[22] *Clark v. Packem Assoc.*, 1991 WL 36470 at *24 n.14 (Del. Ch. Mar. 6, 1991) (citation omitted).

[23] *Id.*

[24] *Fairwinds Shopping Center, Inc. v. Bd. of Adjustment of New Castle County*, 1993 WL 258801, at *4 (Del. Super. June 4, 1993).

[25] *Wawa, Inc. v. New Castle County Bd. of Adjustment*, 929 A.2d 822, 830 (Del. Super. 2005).

free from legal error, I may reverse, affirm wholly or in part, or modify the Board's decision, but I may not remand the case to the Board for further determinations.[26]

## V. ANALYSIS

### A. The *Kwik-Check* Test

Municipal Boards of Adjustment were created by the General Assembly to:

> [a]uthorize, in specific cases, such variance from any zoning ordinance, code or regulation that will not be contrary to the public interest, where, owing to special conditions or exceptional situations, a literal interpretation of any zoning ordinances, code or regulation will result in *unnecessary hardship* or *exceptional practical difficulties* to the owner of property so that the spirit of the ordinance, code or regulation shall be observed and substantial justice done, provided such relief may be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of any zoning ordinance, code, regulation or map.[27] [Emphasis supplied]

Delaware courts recognize two types of "variances" from zoning code requirements: (i) a "use variance," where a property owner seeks to use their property for a particular use not permitted by the zoning classification; and (ii) an "area variance," where a property owner seeks relief from a dimensional requirement or limitation. Here, a use variance is unnecessary because the hotel and other commercial uses of the Property are permitted by the existing zoning classification. Rather, Applicant sought an area variance, as they sought relief from the floor area limitations imposed by the 2.0 FAR requirement.

---

[26] 9 *Del. C.* § 1314(f); *Dexter*, 1996 WL 658861, at *3.
[27] 22 *Del. C.* §327(a)(3).

11

In *Board of Adjustment v. Kwik-Check Realty, Inc.*,[28] the Delaware Supreme Court held that the less burdensome "exceptional practical difficulty" test applies to area variances, and the more burdensome "unnecessary hardship" test applies to use variances. The Court set forth a four-factor test to determine whether an area variance should be granted. Those four factors (often referred to as the "*Kwik-Check* test") are:

    (1) the nature of the zone in which the property lies;

    (2) the character of the immediate vicinity and the uses contained therein;

    (3) whether, if the restriction upon the applicant's property were removed, such removal would seriously affect such neighboring property and uses; and,

    (4) whether, if the restriction is not removed, the restriction would create … exceptional practical difficulty for the owner in relation to his efforts to make normal improvements in the character of that use of the property which is a permitted use under the use provisions of the ordinance.[29]

I will consider each of the *Kwik-Check* factors separately, although in my view in the final analysis they must be viewed collectively and holistically rather than mechanically or mathematically.

First, the Variance has been requested to redevelop the Property for hotel and retail use. This is consistent with the commercial zoning classification of the Property, and

[28] 389 A.2d 1289 (Del. 1978).
[29] *Kwik-Check*, 389 A.2d at 1291.

Appellant appropriately concedes that this standard has been satisfied.[30]

Second, granting the Variance would enable the redevelopment of the Property in a way that conforms to the character of the immediate vicinity and the uses contained therein. The character of the immediate vicinity near the Property, and the uses contained therein, include restaurants, hotels, parking lots, and retail uses. If the Variance is granted, the redeveloped Property would include underground parking and retail shops at the street level; if the Variance is not granted, the redeveloped Property would include surface parking at the street level and no retail shops. Either way, the redevelopment of the Property would conform to the existing character of the immediate vicinity and the existing uses contained therein.

Third, granting the Variance would not seriously (or negatively) affect neighboring properties and uses. Only one neighboring property owner testified at the hearing. Although he was generally in favor of the redevelopment project, he expressed concerns about potential fire safety issues. However, there was testimony that the State Fire Marshall was not opposed to the redevelopment project. In my view, fire safety issues are not directly related to the Variance request, but will be fully vetted and addressed with the State Fire Marshall as the redevelopment proceeds. Neither would granting the Variance eliminate the need for the redevelopment project to go before the

---

[30] Op. Br. 15-16.

Planning Commission for site plan approval before a building permit was issued.[31] Concern was expressed at the hearing and in written submissions that the redevelopment project would block sky and ocean views. Notably, the CDP states, "The current height restrictions of 42 feet for any building that faces the Boardwalk appear adequate to assure that new buildings do not shade the beach during the day."[32] Since the redeveloped Property will conform to the CDP height standards, these concerns are unfounded. Appellant contends that a 3.0 FAR hotel would overwhelm the surrounding vicinity and the immediate area. However, the height, the bulk, and the footprint of the building would be essentially the same under either FAR; i.e., any dimensional change is minimal. To put it succinctly, the harm to Applicant if the Variance is denied outweighs any harm to Appellant – and other neighboring properties – if the Variance is granted.

The fourth, and perhaps most difficult, factor is the "exceptional practical difficulty" factor. The standard that applies to area variances considers "whether a literal interpretation of the zoning regulations results in exceptional practical difficulties of ownership."[33] This standard is satisfied only when the difficulties alleged by the owner are practical rather than theoretical and exceptional rather than routine.[34] In *Kwik-*

---

[31] The City Solicitor stated that such review was not required at the variance stage of the development process, and that the granting of a variance would not eliminate the need for the redevelopment project to go before the Planning Commission for site plan approval before a building permit was issued.
[32] 2010 Rehoboth Beach Comprehensive Dev. Plan, 35.
[33] *Kwik-Check Realty Co., Inc. v. Board of Adjustment of New Castle County,* 369 A.2d 694, 698 (Del. Super. 1977).
[34] *Kwik-Check*, 389 A.2d at 1291.

14

*Check,* the Supreme Court of Delaware concluded that "[t]he inability to improve one's business, or to stay competitive as a result of area limitations," may qualify as a legitimate "exceptional practical difficulty" that would justify granting the Variance.[35] An exceptional practical difficulty exists "where the requested dimensional change is minimal and the harm to the applicant if the variance is denied will be greater than the probable effect on the neighboring properties if the variance is granted."[36]

Both parties acknowledge that a hotel could be built on the Property without increasing FAR from 2.0 to 3.0 and, since it would cost less to build, Applicant would actually obtain a greater return on investment than by building a 3.0 FAR hotel. Since no economic difficulty would be suffered by Applicant if the Variance is denied, argues Appellant, there is no exceptional practical difficulty for Applicant. Applicant can still build a Zoning Code-compliant hotel with 110 rooms, surface parking, no street level retail shops, smaller rooms and balconies, and no meeting rooms, restaurant, or bar. Building an upscale hotel of one's dreams is not a "normal improvement in the character of that use of the Property" when a less upscale hotel will suffice under the Zoning Code.

Applicant counters that, without the Variance, its aesthetic vision for the hotel could not be realized. That vision includes a few additional (116) rooms, greater architectural detail, underground parking, street level retail shops, larger balconies with

---

[35] *Id.*
[36] *Id.*

awnings, meeting rooms for conventions and conferences, a restaurant, and a bar. Applicant claims that the high cost of building underground parking cannot be borne without the higher room and amenity revenues from a 3.0 FAR hotel offsetting that cost. Thus, if the 2.0 FAR restriction is not removed, it would create exceptional practical difficulty for Applicant in relation to its efforts to build an overall better hotel, more in keeping with the surrounding character of the area, offering increased economic benefits to the City, and consistent with the goals of the CDP.

This raises the issue of whether the inability of a developer to realize its aesthetic vision for a redevelopment project constitutes an "exceptional practical difficulty," since it is imposed by the developer on itself and not by the municipality or its zoning code on the developer. The *Kwik-Check* test does not address what subjective factors may or may not be motivating Applicant. Appellant's argument that an "upscale" project is not a "normal" improvement is another way of saying that Applicant's desire to build an "upscale" hotel is a "self-created" hardship and therefore the Variance should be denied. However, Delaware courts have held that a "self-created" hardship is not a *per se* bar to the grant of a variance. In *Dexter v. New Castle County Bd. Of Adjustment*,[37] a homeowner wanted to partially convert a garage into a residence. The Superior Court reversed the board of adjustment's denial of a variance based on the exceptional practical difficulty test:

---

[37] 1996 WL 658861 (Del. Super. Sept. 17, 1996).

[T]he Board suggests that because the structure satisfies the code requirements if it is utilized as a garage, the mere fact that Appellants want to use it as a residence makes their hardship self-created. However, a self-created hardship is one created by affirmative action on the part of the applicant which resulted in a condition requiring the variance. Alternatively, the hardship arises out of the applicant's personal desire to use the property in a particular manner which is prohibited by the provisions of the applicable zoning code as opposed to a problem inherent in the property itself. Moreover, the Court notes that to some degree every application for a variance request is "self-created" as the application necessarily arises from the applicant's personal desire to use the property in a certain manner. Given this interpretation, the Court must conclude that the Board incorrectly applied the "self-created" hardship doctrine to the facts of this case and erred as a matter of law in concluding that the Appellants did not experience exceptional practical difficulty.[38]

Our Supreme Court has stated that, in Delaware, there is no *per se* bar against a variance for a self-imposed hardship. The question is whether an applicant has adequately demonstrated that his difficulty justifies the grant of a variance.[39]

Another Delaware Supreme Court case affirmed the grant of an area variance driven by aesthetic concerns. In *Marriott Corp. v. Concord Hotel Management, a Div. of Concord Towers Inc.*,[40] the Delaware Supreme Court reversed a Superior Court decision and upheld the grant of a variance that would permit slightly smaller and fewer parking spaces, thereby increasing the amount of open space and landscaping on the site.[41] It was undisputed that the two proposed hotels (and a small restaurant) could be built with the larger parking spaces and additional parking spots, and there was no

---

[38] *Id*, at *6.
[39] *McLaughlin v. Board of Adjustment of New Castle County*, 984 A.2d 1190, 1193 (Del. 2009) (citation omitted).
[40] 578 A.2d 1097 (Del. 1990) (Table, text available at 1990 WL 109878).
[41] *Id*., at *2.

evidence that the proposed hotels could be operated less profitably without the variances. The only reason for the requested variance was the applicant's desire to provide better aesthetics and landscaping with the additional open space created by slightly smaller and fewer parking spaces. The Supreme Court affirmed the Board's decision, quoting from the Board's decision that:

> [T]he Board is convinced that the applicant is suffering exceptional practical difficulty so as to justify the relief requested . . . the harm to the applicant if the variance is denied would be greater than the probable effect on neighboring properties if it's granted.[42]

In so affirming, the Supreme Court made no suggestion that a desire for greater aesthetics was an improper basis for a variance and found the Board had properly applied the *Kwik-Check* test.

In this case, Applicant argues that the essential aesthetic difference between the 2.0 FAR hotel and the 3.0 FAR hotel is that the former would have street level parking and no retail shops, and the latter would have underground parking and street level retail shops. In addition, the 3.0 FAR hotel would have conference space and other amenities, allowing the hotel to function year-round as a conference center, and a quality restaurant and bar. I find that these aesthetic considerations of Applicant are not a bar to the Board's grant of the Variance, particularly when taken into consideration along with the other *Kwik-Check* factors discussed herein.

---

[42] *Id.*, at *3.

Rather, in my view this case comes down to the exceptional practical difficulty of Applicant paying for the significant cost of underground parking without being granted relief to build to a higher density above-ground, such that the redeveloped Property will generate sufficient revenue to offset that cost. Perhaps the case most on point is *Boyd v. Heffron*,[43] in which the developer requested a variance from the Wilmington Board of Adjustment to increase FAR from 3.5 to 5.9 (a 68% increase) to build a luxury apartment complex with larger rooms. Testimony was given to explain the requested FAR variance. It was stated that there was a process between development costs and project economics which dictates a certain level of rentable square footage to make the project viable. Due to certain fixed costs (e.g., land costs, building equipment costs, site improvement costs), reducing the number of rental units does not reduce the cost per unit. However, increasing the number of rental units does reduce the cost per unit by spreading the fixed costs over the entire project. Initially, the developer's plan conceived of a building housing 250 to 300 units. However, due to design criteria and economic feasibility, the plan was scaled down to its present number of 250 units. This number was a compromise which addressed the builder's concern of his fixed costs and the top dollar rental cost the market could absorb. This variance request to allow a FAR of 5.9 was not a variance intended to increase the number of units requested, but rather one to accommodate the increased size of each apartment unit, with the concomitant higher rent. The developer

---

[43] 1987 WL 28314 (Del. Super. Dec. 11, 1987).

was interested in a luxury apartment complex, appealing to those middle to upper income city workers with families. Should the variance not be granted, testimony revealed that the project as it was conceived would not be economically feasible and probably would not proceed. It was technically possible to build 250 units and meet the 3.5 FAR requirement. However, that would require apartment size to be drastically reduced. These smaller units would not be marketable, nor would they be compatible with the surrounding neighborhood community.

The higher 5.9 FAR was also a consequence of the zoning code requirement which required on-site parking. Needing to maximize the on-site parking without resorting to a three-level above grade lot (the plan allowed for two parking levels), the builder increased the portion of the lot to house the parking, and decreased the lot area of the apartments. Therefore, decreasing the lot area while increasing the area of the living units created the higher FAR requested.

The Superior Court found that the increased FAR would not adversely impact the surrounding community. FAR is the method used to control density. The larger the FAR the greater the density and the larger number of units that can be accommodated by the building mass. Here, although the builder had requested a higher FAR, it had not sought to increase the number of units, which would have detrimentally raised the population density of the residentially zoned area. The Superior Court concluded that the Board was within its rights when it concluded that increasing this FAR would not seriously affect

the neighborhood property. Despite a much greater FAR, there was no evidence that there would be an impairment of the value of the homes in the adjoining single-family neighborhood. The Board by its decision found the builder's desire to accommodate family living in upscale, large sized apartments to be to the community's benefit, and that requiring the developer to abide by the 3.5 FAR would stagnate, or halt altogether, the project to the detriment of both the developer and the surrounding community.

The Superior Court found that there was sufficient evidence before the Board to justify its granting of a variance permitting the 5.9 FAR in the residential zone and upheld the variance.

In this case, the proposed 3.0 FAR is not just designed for more or larger rooms, but to allow for underground parking and provide a conference center, amenities, and ground-level retail shops. Even so, the overall height and mass will be essentially the same.

### B. Zoning Code vs. CDP

At oral argument, counsel for the Board indicated that Delaware courts have stricken county and municipal ordinances found contrary to applicable comprehensive development plans. This statement was made in connection with an argument that, to the extent the City's Zoning Code was inconsistent with the CDP, the CDP might govern. I asked counsel to provide those cases, which he did by a letter dated September 8, 2022. The other parties have not yet filed responses to this letter.

At the Board's public hearing, the former Chair of the City Planning Commission stated that the 2.0 FAR plan has "no merit" and was "inconsistent with the CDP."[44] He further urged the Board to grant the requested variance to allow the 3.0 FAR alternative, explaining that "[t]his is a unique opportunity for the City of Rehoboth to allow exactly what the 2010 CDP intended."[45]

I have reviewed the cases which counsel submitted and thank him for his submission. I have not yet heard from the other parties. However, since I have decided this case within the four corners of the Zoning Code and applicable law pertaining to variances therefrom, in my view the issue of whether the CDP can override the Zoning Code is moot and, under settled issues of judicial restraint, need not be addressed or decided at this time, but can wait for another day.

### C. Substantial Evidence on the Record

As discussed above, my job is not to evaluate the merits and demerits of the proposed redevelopment of the Property. My job is to determine whether there is substantial evidence on the record before me to support the Board's decision.

Appellees point out that there are thirteen findings of fact by the Board, all of which are supported by a significant amount of testimony, letters, exhibits and other documents.

---

[44] Tr. at 150.
[45] Tr. at 151.

22

Appellant states that there is a dearth of technical and scientific data to support Appellees' claims, but rather self-serving statements from Applicant and his team. Appellant complains that there was "no consideration of the contrary evidence or Board findings of fact resolving conflicting testimony and evidence."[46] However, I am unaware of any requirement that the Board must discuss *all* the evidence presented before it, and Appellant cites no authority for that proposition. Rather, the Board's failure to discuss adverse statements may simply be indicative of the fact the Board did not credit those statements, or its recognition that such statements were without merit or not credible. In any event, the Board's decision will be upheld where it is supported by "more than a scintilla but less than a preponderance" of the evidence.[47]

After a thorough review of the record, I am of the view that there is more than sufficient evidence on the record to support the decision of the Board.

### D. Errors of Law

Appellant asserts that the Board also erred as a matter of law by failing to even cite in its analysis the relevant *Kwik-Check* legal test or its four factors, much less provide an actual analysis of those four factors based upon substantial evidence. Appellant urges me to reverse on that ground alone. While it might have been helpful if the Board had expressly cited the *Kwik-Check* test and applied its four factors in a

---

[46] Op.Br. at 14- 15.
[47] *Olney v. Cooch*, 425 A.2d 610, 614 (Del. 1981) (citations omitted); *Mellow v. Board of Adjustment*, 565 A.2d 947, 954 (Del. Super. 1988), *aff'd*, 567 A.2d 422 (Del. 1989) (Table).

23

fulsome legal analysis, in my view this is not essential. The Board is not required to be composed of lawyers and the decision of the Board is not a legal opinion. It is an administrative decision. As such, so long as the four factors of the *Kwik-Check* test were in fact applied to the facts of the case, and that application was consistent with *Kwik-Check*, there is no legal error. In my view the Board addressed the appropriate factors validating its decision.

## VI. CONCLUSION

For the reasons discussed above, the Decision of the Board of Adjustment of the City of Rehoboth Beach is **AFFIRMED**.

**IT IS SO ORDERED.**

/s/ Craig A. Karsnitz

cc: Prothonotary