# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

LEVI YODER, )
                                  )    C.A. No. K24A-04-004 RLG
         Claimant-Below/ )
         Appellant, )
                                    )
TWIN RIVER MANAGEMENT )
GROUP, INC., )
                                    )
         Employer-Below/ )
         Appellee. )

Submitted: February 17, 2025
Decided: August 4, 2025[1]

## MEMORANDUM OPINION AND ORDER

*Upon Appeal from a Decision of the*
*Industrial Accident Board – REVERSED.*

Walt F. Schmittinger, Esq., Schmittinger & Rodriguez, P.A., Dover, Delaware.
*Attorney for Appellant Levi Yoder.*

Geoffrey S. Lockyer, Esq., Tybout, Redfearn & Pell, Wilmington, Delaware.
*Attorneys for Appellee Twin River Management Group, Inc.*

**GREEN-STREETT, J.**

---

[1] The transcript from the hearing in this matter was requested by the Court on February 18, 2025, the day after oral argument, but has not been received as of the date of this decision. To expedite a decision for the involved parties, the Court issued this decision without receipt of the official transcript. Any reference to the oral argument in this decision cites the audio recording through the Delaware State Courts For The Record software.

## I.  Introduction

A 62-year-old man with an extensive employment history in manual labor suffered a hip injury while working.  After doctors cleared him for sedentary work only, his former employer sought to end his total disability benefits by contending he could transition to a sedentary office job.  The Industrial Accident Board ruled in favor of the employer.  This appeal followed.  As the Industrial Accident Board's decision hinged on unreliable evidence, its decision must be **REVERSED**.

## II.  Factual and Procedural Background

Twin Rivers Management Group (the "Employer") employed Levi Yoder as a "stewarding supervisor."[2]  "Stewarding supervisor," as far as this Court can discern, amounts to Employer's description of a janitor who occasionally trains other janitors.  In the course of that employment, Mr. Yoder fell and suffered a hip injury.[3] That injury rendered Mr. Yoder totally disabled for a time.  The parties do not meaningfully dispute his medical treatment, rehabilitation process, or current medical clearance.[4]

On September 15, 2023, Employer filed a petition to review Mr. Yoder's total disability benefits, contending Mr. Yoder could resume work in a sedentary

---

[2] Tr. of Hearing before the Industrial Accident Board at 18 (hereinafter, "Tr. at __").

[3] Opening Br. at 2, D.I. 7 (July 7, 2024); Answering Br. at 5, D.I. 10 (Aug. 23, 2024).

[4] Id.

capacity.[5]  The Industrial Accident Board (the "Board") convened a hearing on Employer's petition on March 26, 2024.[6]  Both parties presented the deposition testimony of their respective medical experts, and both parties agreed those experts cleared Mr. Yoder to return to sedentary work.[7]  The parties further agreed the primary issue before the Board concerned whether Mr. Yoder qualified as a *prima facie* displaced worker.[8]

## A.    The Hearing

Employer presented the testimony of Robert Stackhouse, a vocational counselor.[9]  Mr. Stackhouse prepared a labor market survey to outline the employment opportunities available to Mr. Yoder given Mr. Stackhouse's knowledge of Mr. Yoder's medical restrictions, work experience, and education.[10]  Mr. Stackhouse testified he searched for job openings classified as sedentary.[11]  He explained he based much of his understanding of Mr. Yoder's work experience on:

---

[5] Answering Br. at 5.

[6] Tr. at 1.

[7] Opening Br. at 3; Tr. at 5 ("we have substantial agreement about the ultimate question of work restrictions as it relates to the doctors.") (cleaned up).

[8] Tr. at 4-5.

[9] Id. at 13-14.

[10] Id. at 16-17.

[11] Id. at 16.

a job description he acquired from Employer; Mr. Yoder's work application to Employer; and information gleaned from Mr. Yoder's Facebook account.[12]

Mr. Stackhouse assumed Mr. Yoder possessed a high school diploma.[13]  He described Mr. Yoder's work history before his work with Employer as "primarily responsible for care taking with animals or maybe upkeep of equipment and that type of thing."[14]  Mr. Stackhouse noted the job requirements listed for Mr. Yoder's job with Employer specified a high school diploma; good math skills; computer proficiency, specifically with Microsoft Word; good written and verbal communication skills; and customer service skills.[15]

Mr. Stackhouse referred to Mr. Yoder's Microsoft Word proficiency as "significant."[16]  He listed Mr. Yoder's responsibilities as: directing work assignments; "controlling payroll through proper employee scheduling;" adjusting scheduling; conducting interviews; making hiring determinations; and making

---

[12] Id. at 16-19.

[13] Id. at 18.

[14] Id.

[15] Id. at 19.

[16] Id. at 21.

4

decisions regarding the retention of other employees.[17] Mr. Stackhouse also understood Mr. Yoder to speak Spanish.[18]

Mr. Stackhouse presented a labor market survey that listed twelve job openings for which he believed Mr. Yoder qualified.[19] The Board found "that some of the jobs [were] not reasonable for [Mr. Yoder]," and trimmed the list of appropriate job openings down to five.[20] The Board did not expound further on why it discounted the other seven openings proffered by Mr. Stackhouse.

The jobs the Board considered encompassed the Boys and Girls Club, the Department of Transportation, Winner Body Shop, and two positions at Transcore.[21] Mr. Stackhouse testified all these jobs were located a reasonable driving distance from Mr. Yoder's home.[22] Mr. Stackhouse further explained that these positions were entry-level.[23] He also noted, "when I say entry level[, it's] at least at that level

---

[17] Id. at 19-20.

[18] Id. at 21.

[19] Id. at 22.

[20] The Board's Decision on Petition for Review to Terminate Benefits at 18 (hereinafter, "Decision at __").

[21] Id.

[22] Tr. at 24.

[23] Id. at 26.

they're looking for a high school degree or beyond.  And there may be also cases where they're looking for computer familiarity."[24]

Mr. Stackhouse described the first position at Transcore as "sitting behind a counter with plexiglass protection[,] and they're dealing with folks at EZ-Pass [sic] transaction questions and signups and complaints."[25]  The job description provided by Mr. Stackhouse in his labor market survey listed the educational requirements as a high school education, excellent communication skills, and familiarity with computers.[26]  The second position at Transcore involved reviewing EZ-Pass pictures to identify the license plate numbers of cars failing to pay tolls.[27]  The listed prerequisites for that position specify a high school education, computer familiarity, and "excellent visual acuity."[28]

The position with the Boys and Girls club entailed signing in children as they entered the club, scheduling, processing payments, and general customer service duties.[29]  That position sought an employee who possessed a high school diploma –

---

[24] Id. at 27.

[25] Id. at 26.

[26] Employer's Ex. 2.

[27] Tr. at 29.

[28] Employer's Ex. 2.

[29] Id.

or its equivalent – and computer proficiency.[30]  Mr. Stackhouse testified that the Boys and Girls club had closed that job opening by the time of Mr. Yoder's hearing.[31] The job opening at the Department of Transportation involved answering phone calls, assisting customers, processing payments, operating computer equipment and printers, and calculating "penalties affixed by law."[32]  Training was to be provided for that job, with the Department of Transportation requiring "6+ months experience in customer service [and] document processing."[33]

During cross-examination, Mr. Stackhouse confirmed he based his assessment of Mr. Yoder's transferable skills on "an application [to work for Employer], the job description [provided by Employer,] and an awareness that he had a Facebook."[34] Mr. Stackhouse did not speak with anyone from Employer regarding Mr. Yoder's position.[35]  When asked if the job description an employer posts for a given job may not align with the realities of that job, Mr. Stackhouse replied, "in general, I would say no.  Is it possible that it doesn't? Yes."[36]  Mr. Stackhouse explained he could

---

[30] Id.

[31] Tr. at 40.

[32] Employer's Ex. 2.

[33] Id.

[34] Tr. at 41.

[35] Id. at 42.

[36] Id.

perform a job analysis to determine if a job description matched the actual job.[37]  Mr. Stackhouse did not, however, perform a job analysis relating to Mr. Yoder's case.[38] On re-direct examination, Mr. Stackhouse clarified that the job description provided by Employer required "[a] high school diploma, [a] GED[,] or equivalent work experience."[39]

The Board also heard testimony from Mr. Yoder.  Mr. Yoder testified he was 62 years old, and worked for Employer for 12 years before his injury.[40]  He described his job as helping with cleaning and training new employees.[41]  He noted he "did not do much on the computer at all."[42]  He explained training new employees entailed "showing them how to do the cleaning."[43]  He testified he did not interact with the public as part of his job.[44]  His manager oversaw all interviews for new staff, and executed all hiring and firing decisions.[45]

---

[37] Id. at 43.

[38] Id.

[39] Id. at 54.

[40] Id. at 63.

[41] Id. at 63-64.

[42] Id. at 64.

[43] Id. at 65.

[44] Id.

[45] Id. at 85.

8

As for his education, Mr. Yoder completed through the eighth grade at the West Center Amish School.[46] The teachers at his school, including Mr. Yoder himself as an adult, were members of the Amish community.[47] Graduates were expected to "get a job or work at home on the farm."[48] After graduating, Mr. Yoder worked on his family farm.[49] The farm did not utilize any machinery.[50] Mr. Yoder proceeded to work at a sawmill; a dairy farm that utilized some machinery; and his most recent job with Employer.[51] Mr. Yoder spent four winters teaching at his alma mater, but did not possess any teaching credentials or certifications.[52]

Regarding his experience with paperwork, Mr. Yoder testified he completed a form to indicate the time a space had been cleaned and signed the form with his initials.[53] Mr. Yoder did not own a personal computer.[54] He did not possess

---

[46] Id. at 67.

[47] Id. at 68.

[48] Id. (cleaned up).

[49] Id.

[50] Id. at 69.

[51] Id. at 70.

[52] Id. at 71.

[53] Id.

[54] Id. at 72.

familiarity with Microsoft Word, and needed his manager's help for any scheduling work completed on a computer.[55]

Mr. Yoder speaks three languages – English, German, and Pennsylvania Dutch.[56] He explained he uses his smartphone to look at Facebook and check his email account, but that he needs help from his daughter-in-law to do so.[57] Mr. Yoder attempted to apply to one of the job openings identified by Mr. Stackhouse, but reported he did not successfully complete the application on his phone.[58] Mr. Yoder could not recall why his application to Employer indicated he completed high school.[59] He testified he called every employer listed on the labor market survey, but none of them would accept an application unless he completed it online.[60]

## B.    The Board's Decision

The Board issued its decision on April 5, 2024.[61] The Board found Mr. Yoder medically "capable of working in a full-time sedentary duty capacity."[62] The Board

---

[55] Id.

[56] Id. at 79-80.

[57] Id. at 74-75.

[58] Id. at 81.

[59] Id. at 84.

[60] Id. at 87-88.

[61] Decision at 21.

[62] Id. at 14.

next considered if Mr. Yoder met his burden to prove he qualified as a displaced worker.[63] The Board found, based on his "age, physical limitations, education, mental capacity, and training," that Mr. Yoder did not qualify as a displaced worker.[64] The Board listed Mr. Yoder's transferable skills as "able to do basic math, drive a car, use a smartphone, and function as an adult in today's society."[65]

The Board accepted Mr. Stackhouse's representation that Mr. Yoder could be trained to perform any of the entry level jobs listed in the market survey.[66] The Board determined Mr. Yoder's age did not render him a displaced worker, as "the employers listed on the labor market survey like to hire older people for the jobs listed on the survey because older people are more reliable than the younger generation."[67] The Board concluded Mr. Yoder, by virtue of learning his job with Employer and learning to use a smartphone, demonstrated he could be trained to do any of the jobs in the market survey.[68] As to the various jobs requiring a high school diploma, the Board accepted "Mr. Stackhouse's opinion that most of the jobs listed on the survey accept

---

[63] Id.

[64] Id. at 15.

[65] Id.

[66] Id.

[67] Id. at 15-16.

[68] Id. at 16.

11

work experience in lieu of a high school degree or GED."[69]  As Mr. Yoder did not

qualify as a displaced worker, the Board held he should no longer receive total

disability benefits.[70]

### C.    The Appeal

Mr. Yoder filed a notice of appeal on April 24, 2024.[71]  He filed his Opening

Brief on July 2, 2024.[72]  Employer filed its Answering Brief on August 23, 2024.[73]

Mr. Yoder filed his Reply Brief on October 10, 2024.[74]  The Court held oral argument

on February 17, 2025.  Although requested the day after oral argument, February 18,

2025, no official transcript had been provided to the Court at the time this opinion

was published.

## III.    Standard of Review

When reviewing the Board's decision, this Court limits its examination to "a

determination of whether the agency's decision was supported by substantial

---

[69] Id. at 17 (the Court notes that a review of the Transcript does not show Mr. Stackhouse ever testifying to this premise).

[70] Id. at 24.

[71] D.I. 1 (Apr. 24, 2024).

[72] D.I. 7 (July 2, 2024).

[73] D.I. 10 (Aug. 23, 2024).

[74] D.I. 14 (Oct. 10, 2024).

evidence on the record before the agency."[75]  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[76]  Substantial evidence means "more than a scintilla but less than a preponderance of the evidence."[77]  If the Board relied on substantial evidence, and committed no legal error, its decision must be affirmed.[78]

## IV.  **Analysis**

The parties agree Mr. Yoder may return to sedentary work, and, thus, does not qualify as totally disabled from a medical perspective.[79]  The testimony of both sides' medical experts supports that determination.  Medically, Mr. Yoder can perform a sedentary job.

Once Employer demonstrated Mr. Yoder could work in some capacity, the evidentiary burden shifted to Mr. Yoder to substantiate he qualified as a displaced worker.[80]  A displaced worker, "while not completely incapacitated for work, is so

---

[75] 29 Del. C. § 10142(d).

[76] Oakwood Mobile Homes v. Mosley, 608 A.2d 729 (Del. 1992) (citing Breeding v. Contractors-One-Inc., 549 A.2d 1102, 1104 (Del. 1988)).

[77] Id.

[78] Breeding, 549 A.2d at 1104.

[79] Tr. at 93.

[80] Wyatt v. State, 1998 WL 283469, at *3 (Del. Super. Mar. 27, 1998).

handicapped by a compensable injury that he will no longer be employed regularly in any well-known branch of the competitive labor market."[81]  To qualify for total disability as a displaced worker, a claimant must satisfy two requirements: (1) "he must show that he is an unskilled worker, unable to perform any tasks other than general labor;" and (2) "his inability to perform the duties of a general laborer is causally related to the accident in issue."[82]  Factors that form the basis for these considerations include "the employee's age, education, general background, occupational and general experience, emotional stability, the nature of the work performable under the physical impairment[,] and the availability of such work."[83]

A.    **The Board's determination that Mr. Yoder failed to demonstrate he was a *prima facie* displaced worker is not supported by substantial evidence**

The Board found that Mr. Yoder did not demonstrate he qualified as "an unskilled worker, unable to perform tasks other than general labor."[84]  The Board explained Mr. Yoder:

---

[81] Ham v. Chrysler Corp., 231 A.2d 258, 261 (Del. 1967).

[82] Hensley v. Artic Roofing, Inc., 369 A.2d 678, 679 (Del. 1976).

[83] Roos Foods v. Guardado, 152 A.3d 114, 119 (Del. 2016)

[84] Decision at 15.

14

> is only 62 years old, finished 8th grade at an Amish school, has no language barrier and also speaks and reads in German and Pennsylvania Dutch, can do at least basic math, and has transferable skills based on his work experience.[85]

The Board found Mr. Yoder's work experience "in the janitorial industry" and "as a teacher in the Amish school" indicated his education would not be an impediment to future employment.[86]  However, this Court finds the record before the Board does not support such a finding.

Accepting as true the Board's finding that Mr. Yoder could "do basic math, drive a car, use a smartphone, and function as an adult in today's society," those skills do not translate to the job openings seeking an applicant with computer proficiency.  An ability to use a smartphone does not equate to computer proficiency, especially in the case of Mr. Yoder's unrebutted testimony that he struggles to do much on his smartphone beyond check Facebook and read emails.  The Board does not explain its use of the phrase "function as an adult in today's society," or what exactly that skill incorporates.  As none of the job openings provided by Mr. Stackhouse use this terminology, the relevance of such a skill – insomuch as it exists – remains unclear in this context.

---

[85] Id.

[86] Id.

The Board accepted Mr. Stackhouse's testimony that Mr. Yoder could be trained to do any of the jobs listed because Employer successfully trained him to perform his job – and Mr. Yoder progressed to training other employees. Following the Board's logic to its natural conclusion, any person with manual labor experience has demonstrated they can be trained to work in an office job. That logic would effectively destroy the concept of a displaced worker. Similarly, Mr. Yoder's ability to learn to perform basic tasks on his smartphone does not necessarily translate to an ability to learn an entry-level office job after decades of only working in manual labor.

The Board noted it accepted Mr. Stackhouse's testimony that "most of the jobs listed on the survey accept work experience in lieu of a high school degree or GED," but provided no citation for said testimony.[87] Employer's Answering Brief echoes this sentiment, but similarly fails to provide a supporting citation.[88] During his direct testimony, Mr. Stackhouse noted several times he assumed Mr. Yoder possessed a high school diploma.[89] Mr. Stackhouse based that assumption, in part, on Mr.

---

[87] Id. at 17.

[88] Answering Br. at 22.

[89] Tr. at 18 ("it stated he was a high school graduate"); Tr. at 19 ("the education and requirements that were identified noted that he needed a high school degree"); Tr. at 27 ("in his case, I'm assuming he has a high school degree. So when I say entry level, it's at least at that level they're looking for a high school degree or beyond").

16

Yoder's Facebook page listing his education as West Center Amish Parochial School.[90] As Mr. Yoder's unrebutted testimony explained, that school only educated through the eighth grade.[91] Mr. Stackhouse testified that he indicated to potential employers Mr. Yoder "had a high school degree" when compiling the labor market survey.[92]

On re-direct, Mr. Stackhouse clarified that he believed Mr. Yoder possessed a high school diploma because his job application to work at Employer indicated he did.[93] Mr. Stackhouse also noted, however, that the job requirement for Employer "actually say [sic] high school diploma, GED, or equivalent work experience."[94] That reference to "equivalent work experience" in his own testimony stands as the only time Mr. Stackhouse suggested that an employer may "accept work experience in lieu of a high school degree or GED."

A review of the five jobs the Board considered appropriate for Mr. Yoder reveals how relevant that lack of education would be in Mr. Yoder's job search. Both positions with Transcore require a high school education, with no mention of

---

[90] Tr. at 45.

[91] Tr. at 68.

[92] Tr. at 53.

[93] Id. at 54.

[94] Id.

accepting work experience as a substitute.[95]  The position with the Boys and Girls club – no longer available at the time of the hearing – required "[high school] or equivalent degree."[96]  Those three positions do not reference any willingness on the part of the employer to substitute work experience for educational requirements.  Even if employers were willing to substitute work experience for a high school education absent an express indication of that willingness in their job description – a fact neither Mr. Stackhouse nor any other expert testified to during the hearing – it remains unclear whether Mr. Yoder's work experience consisting entirely of manual labor would be accepted as such a substitute.

Through unrebutted testimony, Mr. Yoder established he only worked in jobs requiring manual labor; he possessed a limited eighth-grade education; and he maintained, at best, a rudimentary ability to use computers.  The Board did not rely on substantial evidence to conclude Mr. Yoder's education would not stand as a barrier to employment.  Similarly, the Board did not rely on substantial evidence to conclude his work history tended to show he could be trained to perform an office job.  A work history consisting entirely of manual labor, particularly labor such as

---

[95] Employer's Ex. 2.

[96] Id.

janitorial duties or caring for animals, does not establish proficiency or ability to learn an office job.

During oral argument, counsel for Employer acknowledged that the labor market survey, and the testimony of Mr. Stackhouse, "referenced information that does not appear to be accurate."[97]  Mr. Stackhouse believed Mr. Yoder possessed a high school diploma; spoke Spanish; and understood how to use technology proficiently.  Although those beliefs were contradicted by unrebutted testimony, Employer contends the expert opinion of Mr. Stackhouse still qualifies as reliable after excising any "inaccurate" information.[98]

As the Board's decision relies on Mr. Stackhouse's expert opinion, that opinion must constitute substantial evidence.  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[99]  That Mr. Stackhouse relied on so many factual inaccuracies in preparing his expert report calls the validity of the entire report into question. Even accepting Employer's proposal to excise the inaccurate information from Mr. Stackhouse's testimony, the Court cannot conclude the Board based its

---

[97] Audio Recording of Oral Argument at 2:40:49 (Feb. 17, 2025) (Accessed through For The Record – Delaware State Courts).

[98] Audio Recording of Oral Argument at 2:45:22.

[99] Sabo v. Pestex, Inc., 2004 WL 2735457, at *3 (Del. Super. Oct. 28, 2004), aff'd, 892 A.2d 1084 (Del. 2006) (citing Oceanport Ind. V. Wilmington Stevedores, 636 A.2d 892, 899 (Del. 1994)).

determination on substantial evidence. Mr. Stackhouse testified that a posted job description generally aligns with the requirements of the job.[100] The Board's conclusion that Mr. Yoder may qualify for some of the jobs identified in the labor market survey – despite having no transferable skills identified in those job descriptions and lacking the requisite education sought by those employers – does not follow logically from Mr. Stackhouse's testimony.

## B. Employer did not meet its burden to show regular employment was within Mr. Yoder's capabilities

"Where a claimant is successful in showing that [he] is a displaced worker, either *prima facie* or actually, the burden shifts to the employer to show availability to the worker of regular employment within the worker's capabilities."[101] Although the Board did not find Mr. Yoder successfully established displaced worker status, the Board proceeded to analyze whether Employer successfully demonstrated there were appropriate jobs attainable for Mr. Yoder.[102] The Board, relying entirely on the labor market survey created by Mr. Stackhouse, concluded that Employer did meet that burden.

---

[100] Tr. at 42.

[101] Roos Foods, 152 A.3d at 120.

[102] Decision at 17.

As Mr. Stackhouse believed Mr. Yoder possessed a high school diploma when he conducted that survey, the results skew toward unreliable. Though the Board did not explain its reasoning for doing so, its decision to exclude all but five of the job openings from its analysis reflect some acknowledgment that Mr. Stackhouse may have employed a faulty process.[103] As noted above, three of the jobs the Board did consider require a high school diploma or equivalent education, something Mr. Yoder does not possess.[104] The Board did not rely on substantial evidence in finding those jobs were appropriate for Mr. Yoder.

The two remaining jobs were a position with the Department of Transportation and a receptionist job at Winner Ford Hyundai.[105] The position with the Department of Transportation required at least six months of customer service experience and document processing.[106] Mr. Stackhouse's testimony regarding Mr. Yoder's work experience with Employer – based entirely on a job description provided by Employer – suggested Mr. Yoder's customer service experience, at best, amounted to conducting himself professionally in a casino environment.[107] Aside from

---

[103] Id.

[104] Id. at 18.

[105] Employer's Ex. 2.

[106] Id.

[107] Tr. at 34.

21

initialing forms indicating when he had cleaned a specific area, no evidence on the record indicated Mr. Yoder had any experience in document processing. The receptionist job description outlines that "training is provided, although prior office experience is helpful. Prior knowledge of auto industry is beneficial; not required; computer literacy sought."[108] Though not required, Mr. Yoder does not have the prior office experience nor knowledge of the auto industry sought by the employer.

To overcome a finding that a worker qualifies as a displaced worker:

> [Jobs] must be realistically within reach of the disabled person. It would indeed work a hardship on a disabled person if total disability benefits could be cut off any time an employer could merely show that jobs existed which claimant could physically perform[,] and [ ] such jobs were generally available.[109]

Substantial evidence does not exist in the record to support a finding that any of the jobs the Board considered appropriate are realistically within Mr. Yoder's reach. Beyond bare assertions that Mr. Yoder can be trained, nothing in the record suggests he would be a competitive applicant for these jobs.

## V.    Conclusion

The Board found that Mr. Yoder does not qualify as a *prima facie* displaced worker. That finding was not based on substantial evidence. Further, the Board

---

[108] Employer's Ex. 2.

[109] Abex Corp. v. Brinkley, 252 A.2d 552, 553 (Del. Super. 1969).

found that Employer met its burden to show available job opportunities for which Mr. Yoder qualified. That finding was not based on substantial evidence. "A proper application of the displaced worker doctrine can only be made by considering the contemporaneous availability of employment."[110] It would be inappropriate to remand this matter and require the Board to evaluate Mr. Yoder's employability based on an outdated labor market survey.[111] Accordingly, the Board's decision is **REVERSED**. Employer retains the ability to file a new petition for review, without prejudice, should it choose to do so.

    **IT IS SO ORDERED.**

_____
Reneta L. Green-Streett, Judge

---

[110] Adams v. Shore Disposal, Inc., 720 A.2d 272, 274 (Del. 1998).

[111] Id.